UNITED STATES, Appellee,

v.

Jerry P. SOJFER, Hospital Corpsman First Class, U.S. Navy, Appellant.

No. 96–1008.
Crim.App. No. 94–01935.

U.S. Court of Appeals for the Armed Forces.

Argued Oct. 8, 1997.

Decided Feb. 11, 1998.

Sullivan, J., filed opinion concurring in the result.

For Appellant: *Lieutenant Dale O. Harris*, JAGC, USNR (argued); *Lieutenant Commander Howard B. Goodman*, JAGC, USN (on brief).

For Appellee: *Lieutenant Carmen B. Krueger*, JAGC, USNR (argued); *Colonel Charles Wm. Dorman*, USMC, *Commander D.H. Myers*, JAGC, USN, and *Lieutenant Colonel J. Steve Hinkle*, USMCR (on brief); *Major Stephen Finn*, USMC, and *Lieutenant Kevin L. Flynn*, JAGC, USNR.

*Opinion of the Court*

CRAWFORD, Judge:

Contrary to his pleas, appellant was convicted by a general court-martial composed of officer and enlisted members of dereliction of duty (3 specifications), maltreatment (4 specifications), and indecent assault (4 specifications), in violation of Articles 92, 93, and 134, Uniform Code of Military Justice, 10 USC §§ 892, 893, and 934, respectively. Appellant committed these offenses against three female sailors, including Airman Apprentice (AA) S and Airman (AN) M, under the guise of performing medical examinations. The convening authority approved the sentence of a bad-conduct discharge, 2 years' confinement, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals set aside the findings of guilty to dereliction of duty, dismissed that Charge and its specifications, and affirmed the sentence. 44 MJ 603 (1996).

We granted review of the following issues:

I. WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION, AND VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION, WHEN HE EXCLUDED DEFENSE EVIDENCE OF AA S'S PRIOR REPORT OF RAPE.

II. WHETHER AGENTS OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE [NCIS] ENGAGED IN INVESTIGATORY MISCONDUCT.

We hold that the military judge did not abuse his discretion in excluding defense evidence of AA S's prior report of rape. Additionally, we hold that the NCIS did not violate appellant's Fifth Amendment or Article 31[1] rights.

FACTS—ISSUE I

Prior to trial, the Government moved *in limine* to exclude any evidence regarding AA S's prior allegation of rape. At an Article 39(a)[2] session, AA S testified that she had been raped by her cousin in December 1991. She did not report the attack until nearly 2 years later while she was in boot camp. At that time, an enlisted staff member of the recruit training command referred her to the Family Service Center for counseling.

The defense team argued:

Your Honor, the defense does—does not take issue with the Government's intention [sic] that this was a truthful report of a rape. It's offered under 608(c) to show bias was established—it's been established through the testimony at the Article 32 hearing that there was an abdominal examination of—of Airman Apprentice S[ ]. Prior rape could very easily have sensitized her to—to contact of any nature and could have—could have created a bias in that sense and could have caused her to misinterpret what was otherwise a legitimate abdominal exam.

---

1. Uniform Code of Military Justice, 10 USC § 831.

2. UCMJ, 10 USC § 839(a).

... The contention is that the rape—the trauma of any rape—the fact that she had discussed it two days earlier with another physician on the 16th of March would have made her vulnerable to—to leading questions and would go to her state of mind at the time she was questioned by Sandy MacIsaac—at the time that she made the complaint against HM1 Sojfer in response to Special Agent Sandy MacIsaac's questioning of her.

The Government's counter-argument was that the fact that AA S had been raped did not make it more likely that she would have a bias under Mil.R.Evid. 608(c), Manual for Courts–Martial, United States (1995 ed.). The military judge excluded any evidence of the prior alleged rape but advised defense counsel that if they had an additional proffer later, he would be willing to reconsider the ruling.

## DISCUSSION—ISSUE I

 For evidence to be admissible, it must be both logically and legally relevant.[3]

The rules of logical and legal relevance also apply to methods of impeachment.

There are various methods of impeachment. Some of them are based on the Military Rules of Evidence: Character for untruthfulness,[4] prior conviction,[5] instances of misconduct not resulting in a conviction,[6] prior inconsistent statement,[7] and bias.[8] Others are based on common-law rules: Prior inconsistent acts,[9] specific contradiction,[10] and "deficiencies in the elements of competency."[11]

 Issue I centers on bias and deficiencies in the elements of competency,[12] also known as capacity to employ one's senses. There are similarities between bias and capacity to observe, remember, and recollect. Both are grounds for impeachment, and both may be proven by extrinsic evidence. However, before the proponent may introduce evidence under either theory,[13] he or she must lay a foundation that establishes the legal and logical relevance of the impeaching evidence. Mil.R.Evid. 401 and 402; *see gen-*

3. *See, e.g., United States v. Breeding,* 44 MJ 345 (1996); *United States v. Carter,* 40 MJ 102 (CMA 1994).

4. Mil.R.Evid. 608(a), Manual for Courts–Martial, United States (1995 ed.).

5. Mil.R.Evid. 609(a).

6. Mil.R.Evid. 608(b).

7. Mil.R.Evid. 613(b).

8. Mil.R.Evid. 608(c); *see, e.g., United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *United States v. Bins,* 43 MJ 79, 84 (1995); *United States v. Toro,* 37 MJ 313, 315 (CMA 1993). Bias is specifically listed in Mil. R.Evid. 608(c). However, there is no corresponding provision in the Federal Rules of Evidence. Thus, the Supreme Court resorted to common law in *Abel.*

9. *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982); *cf. Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

10. *United States v. Toro, supra.*

11. *See, e.g., United States v. Robertson,* 39 MJ 211, 214 (CMA 1994).

12. Generally, courts consider attacks on a witness' ability to observe, remember, or recount an event as a form of impeachment separate from

bias. *See, e.g., Henderson v. DeTella,* 97 F.3d 942, 949 (7th Cir.1996); *United States v. Smith,* 77 F.3d 511, 516 (D.C.Cir.1996); *United States v. Butt,* 955 F.2d 77, 82 (1st Cir.1992); *United States v. Phelps,* 733 F.2d 1464, 1472 (11th Cir. 1984); *Clouse v. Fielder,* 431 N.E.2d 148, 156 (Ind.App.1982); *State v. Harvey,* 242 N.W.2d 330, 336 (Iowa 1976).

13. *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (trial judge erred in not allowing cross-examination of alleged victim on whether she was living with appellant's half-brother to show bias and holding error was not harmless beyond a reasonable doubt). "An accused has the right to present evidence that is both 'logically and legally relevant.'" *Bins,* 43 MJ at 84; *United States v. Sasso,* 59 F.3d 341, 347–48 (2d Cir.1995) (no improper limitation on cross-examination where defendant could not show witness' prior accident or alleged use of antidepressants affected her ability to perceive or understand events and also where defendant extensively cross-examined witness on tendency to overreact and personal bias against co-defendant); *United States v. Gray,* 40 MJ 77 (CMA 1994)(appellant denied rights under Confrontation Clause where judge excluded evidence (1) that victim's family had motive to accuse him of sexual molestation; (2) of child victim's sexual activity and knowledge; and (3) that appellant had legitimate purpose for initial contact with victim's family).

*erally* E. Imwinkelried, *Evidentiary Foundations* (3d ed.1995).

How a witness "views" an event, in terms of her five senses, depends on her background, including family life, education, and day-to-day experiences. Witnesses "behave according to what [they] bring to the occasion, and what each of [them] brings to the occasion is more or less unique." [14] In that sense, each witness has a bias.

Additionally, a witness' interpretation of an event depends on whether her perception is impaired. For example, the individual may be hearing-impaired or may not have been wearing corrective lenses at the time of the crime. A past or present mental condition also may impact on a person's ability to perceive.[15]

■ Neither the common-law rules nor the rules of evidence may trump the defendant's Sixth Amendment right to cross-examine opposing witnesses. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). In *Davis*, the Supreme Court held that a state law designed to protect the confidentiality of juvenile convictions could not be used to preclude defense cross-examination of a crucial prosecution witness. 415 U.S. at 319, 94 S.Ct. at 1112. There, a bar was broken into and a safe weighing several hundred pounds was removed. It was found 26 miles from the site of the breaking and entering, just outside the home of Jess Straight and his family. Straight's step-son, Richard Green, told investigators that he had seen two unknown men standing alongside a late-model blue Chevrolet near where the safe was discovered. *Id.* at 309, 94 S.Ct. at 1107. Because Green had been placed on probation as a result of a juvenile conviction, the defense sought to cross-examine him to establish that he was identifying other individuals to avoid a revocation of his own probation. *Id.* at 310–11, 94 S.Ct. at 1107–08. The Court held that "the right of confrontation is paramount to the State's policy of protecting a juvenile offender." *Id.* at 319, 94 S.Ct. at 1112.

The defense argued that the prior rape should be admitted because a rape victim is more likely to be biased or misinterpret a proper medical examination. However, the defense offered no support for its theory that a prior rape showed bias or would have an impact on the victim's ability to feel or remember. Had there been a proffer that a mental illness or infirmity affected AA S's capacity to observe and feel, there might be a different result, unless the evidence otherwise was inadmissible under another rule.[16]

In this instance, it is improbable that the victim misinterpreted appellant's placing his hand on her genital area as an indecent assault rather than a proper abdominal examination. Thus, we hold that the judge did not err in excluding the defense evidence.

## FACTS—ISSUE II

Appellant contends NCIS agents twice misrepresented the facts of the case to him. The first instance relates to Special Agent (SA) MacIsaac's interview about these allegations after appellant waived his rights. SA MacIsaac interrogated appellant alone for the first hour and was thereafter assisted by SA Rene Vasquez. Appellant denied the allegations. He told his interrogators that he remembered AN M, and he talked with them about his physical examinations of her. Ap-

14. A. Hastorf & H. Cantril, *Case Reports, They Saw a Game: A Case Study*, 49 J. Abnormal & Social Psychology 129, 133 (1954).

15. The seminal case regarding impeachment based on a mental condition is *United States v. Hiss*, 88 F.Supp. 559 (S.D.N.Y.1950). In *Hiss*, the court properly admitted evidence that a witness had a psychopathic personality disposed to chronic lying. *See also Chnapkova v. Koh*, 985 F.2d 79, 81–82 (2d Cir.1993)(court erroneously excluded evidence concerning plaintiff's psychiatric problems which included evidence she was delusional); *People v. Schuemann*, 190 Colo. 474, 548 P.2d 911, 914 (1976) (error not to admit evidence witness suffered from delusional paranoid schizophrenia which would indicate he was "not an entirely credible witness"); *but see Butt*, *supra* at 83 n. 7 (proper to exclude evidence of depression, suicide attempt, and psychiatric hospitalization because not relevant to credibility and no evidence psychological problems "could bear upon her perceptions of reality").

16. *See, e.g.,* Mil.R.Evid. 412.

pellant admitted examining her abdomen on at least one occasion, but he denied touching her vaginal area.

At one point, SA Vasquez confronted appellant by saying, "You touched her pubic hairs." Appellant immediately responded, "Excuse me. She is shaved." After a moment of silence, SA MacIsaac said, "Well, I know that and Rene Vasquez knows that; how do you know that?" SA MacIsaac knew that AN M shaved her pubic area because this fact was contained in her written statement. However, SA Vasquez was not aware of this. Appellant explained that he saw and felt part of AN M's pubic region during his examination of her abdomen while, he said, an observer was present.

The second misrepresentation was that SA MacIsaac did not disclose to AA S, when he interviewed her, that he was investigating allegations of professional misconduct against appellant. SA MacIssac told AA S that he was conducting a quality assurance review of the sick call records. Appellant first raised the fraud and trickery allegations in his post-trial submissions.

## DISCUSSION—ISSUE II

■ The Fifth Amendment provides: "No person ... shall be compelled in any criminal case to be a witness against himself nor be deprived of life, liberty, or property without due process of law...." Article 31(d),

UCMJ, 10 USC § 831(d), prohibits admission into evidence of any statement from an accused obtained "through the use of coercion, unlawful influence, or unlawful inducement...."

■ In *Hopt v. Utah*, 110 U.S. 574, 583–87, 4 S.Ct. 202, 206–09, 28 L.Ed. 262 (1884), the Supreme Court applied the common-law rule [17] prohibiting use of unreliable confessions. Additionally, the Supreme Court has sought to protect individuals against offensive police practices. *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). That Court has applied a totality-of-the-circumstances test in determining the voluntariness of a confession. *Haynes v. Washington*, 373 U.S. 503, 512, 83 S.Ct. 1336, 1342, 10 L.Ed.2d 513 (1963). Applying this test, "[t]he necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker." *United States v. Bubonics*, 45 MJ 93, 95 (1996). As the Supreme Court indicated in its first case on the subject: "It is difficult, if not impossible, to formulate a rule that will comprehend all cases." *Hopt*, 110 U.S. at 583, 4 S.Ct. at 207. However, over the years, the Supreme Court and this Court have examined numerous circumstances, including rights' warnings;[18] the length of the interrogation;[19] the characteristics of the individual, including age and education;[20] and the na-

---

17. F. Wharton, *A Treatise on the Law of Evidence in Criminal Cases* 562 (9th ed. 1884). "The real question is, whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth, from the fear of the threat, or hope of profit from the promise." *Id.*; *see also* 1 S. Greenleaf, *A Treatise on the Law of Evidence* § 219 at 254 (1842).

18. *See, e.g., United States v. Leiker*, 37 MJ 418, 420 (CMA 1993) (*Miranda* rules issued to counter-balance psychological ploys used by police).

19. *See, e.g., Ashcraft v. Tennessee*, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944)(confession inadmissible where defendant subject to 36 hours' constant questioning by relay of interrogators); *United States v. O'Such*, 16 USCMA 537, 37 CMR 157 (1967) (confession inadmissible where appellant questioned throughout night, proceeded throughout following day, subjected to

severe confinement conditions, threatened and interrogated again).

20. *See, e.g., Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)(confession involuntary where accused held in custody 4 nights and 5 days, subject to intimidation, and had mental age of 9½ years); *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (confession involuntary where youth with subnormal intelligence, weak and in pain, subjected to long interrogation and held incommunicado); *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957)(confession involuntary where accused held in isolation for a week, was uneducated, and had low mental ability); *United States v. Wheeler*, 22 MJ 76 (CMA 1986)(confession voluntary despite appeal to accused's religious beliefs where accused was 22 years old, had high school education, and had "no defect in maturity or intelligence").

ture of the police conduct, including threats,[21] physical abuse,[22] and incommunicado detention.[23]

There is not the slightest indication that appellant sought to stop the interrogation or request an attorney. Nor is there evidence of a lengthy interrogation or that the police made threats and promises to appellant to obtain his statement. Appellant does not have a low IQ, and he completed 12 years of education. Thus, we hold, based on the totality of the circumstances, that appellant's statement was voluntary and admissible in evidence.

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges GIERKE and EFFRON concur.

SULLIVAN, Judge (concurring in the result):

The majority opinion holds that appellant was required to establish an evidentiary foundation before he could question the alleged victim in this case about a prior report of rape by another soldier. This question, however, was asked on cross-examination after the alleged victim had placed her credibility in issue. This line of questioning was permissible under our prior decisions. *See United States v. Gray*, 40 MJ 77 (CMA 1994); *United States v. Bahr*, 33 MJ 228 (CMA 1991).

I also disagree with the majority's conclusion that Granted Issue I can be resolved on the basis that, "[i]n this instance, it is improbable that the victim misinterpreted appellant's placing his hand on her genital area as an indecent assault rather than a proper abdominal examination." 47 MJ at 428. This was a question of fact for the military jury, and our concern is whether a prior rape complaint by the alleged victim against another person was a matter which the members should consider in this case in evaluating her credibility. *See generally U.S. v. Gray* and *U.S. v. Bahr*, both *supra*. The defense should have been allowed to show the possible bias of any witness to the jury. The jury must know if a witness is biased. Accordingly, I would find error under Issue I.

Nevertheless, I join the majority in its conclusion that appellant's case may be affirmed. Initially, I note that the military judge's ruling on this impeachment question was not final and defense counsel failed to pursue this matter at a later time when invited to do so by the military judge. *See United States v. Johnson*, 35 MJ 17, 21 (CMA 1992). Moreover, there were three different victims in this case who testified to three different assaults by appellant during medical examinations, rendering an error in impeachment of one witness much less prejudicial. *Cf. Bahr*, *supra* at 234. Finally, while a large number of complaints of sexual abuse against different men in a short period of time might provide strong support for

21. *See, e.g., Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958)(confession inadmissible where accused "mentally dull," not informed of rights, denied food, denied outside contact for 3 days, and threatened); *United States v. Handsome*, 21 USCMA 330, 45 CMR 104 (1972)(confession involuntary where polygrapher gave horrible example of other robber who lied and impliedly promised to help accused if he told truth); *United States v. O'Such, supra* (confession involuntary where accused suffered harsh confinement conditions, deprived of sleep, questioned for long period of time, and where police threatened to put word out accused had confessed so accused's family would be endangered).

22. *See, e.g., Hysler v. Florida*, 315 U.S. 411, 413, 62 S.Ct. 688, 690, 86 L.Ed. 932 (1942) ("[O]ffensive to the Constitutional guarantees of liberty are confessions wrung from an accused by overpowering his will, whether through physical violence or the more subtle forms of coercion commonly known as 'the third degree.'"); *United States v. Monge*, 1 USCMA 95, 2 CMR 1 (1952)(second confession voluntary despite fact that earlier in day accused held at bayonet point and forced to confess to crime by different individuals).

23. *See, e.g., Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966)(confession involuntary where accused held in confinement for 16 days and not permitted to communicate in person or by telephone); *cf. United States v. Moore*, 4 USCMA 482, 16 CMR 56 (1954)(confession voluntary where accused received no promises or threats and permitted to talk and visit with wife despite fact brother not allowed to visit).

appellant's bias theory, a single complaint long before the alleged rape is far less significant. *Cf. Gray, supra* at 81. In light of these circumstances, I would affirm on the basis of harmless error.

Turning to Issue II, I again agree with the result reached by the majority but am unable to join its rationale for affirmance. Two particular questions are before the Court. The first question is whether misrepresentations by a police officer who interrogated appellant rendered his confession involuntary and inadmissible as a matter of law. *See generally Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969); *Ledbetter v. Edwards*, 35 F.3d 1062, 1068–70 (6th Cir.1994). The second question is whether misrepresentations by a police officer to an alleged victim to secure her report of a crime is "outrageous government conduct" requiring dismissal of the charges against appellant. *See Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985); *United States v. Lemaster*, 40 MJ 178, 181 (CMA 1994) (Sullivan, J., concurring in the result); *United States v. Bell*, 38 MJ 358, 370–74 (CMA 1993) (opinions of Sullivan, C.J., Wiss, J., and Gierke, J.).

The majority does not directly address the impact of the averred lie which the interrogating officer told appellant. However, it does identify that misrepresentation in the context of this case:

SA MacIsaac interrogated appellant alone for the first hour and was thereafter assisted by SA Rene Vasquez. Appellant denied the allegations. He told his interrogators that he remembered AN M, and he talked with them about his physical examinations of her. Appellant admitted examining her abdomen on at least one occasion, but he denied touching her vaginal area.

At one point, SA Vasquez confronted appellant by saying, "You touched her pubic hairs." Appellant immediately responded, "Excuse me. She is shaved."

After a moment of silence, SA MacIsaac said, "*Well, I know that and Rene Vasquez knows that; how do you know that?*" SA MacIsaac knew that AN M shaved her pubic area because this fact was contained in her written statement. *However, SA Vasquez was not aware of this.* Appellant explained that he saw and felt part of AN M's pubic region during his examination of her abdomen while, he said, an observer was present.

47 MJ at 428–29 (emphasis added).

Misrepresentations by the police in the interrogation process do not by themselves render a subsequent confession involuntary and inadmissible. The critical question is whether the misrepresentation was of the type which itself would overbear an accused's will. *See Ledbetter*, 35 F.3d at 1070. I conclude that the police misstatement of the extent of the Government's case could not have overborne appellant's will, and I join the majority's conclusion that his confession was voluntary. *See Amaya–Ruiz v. Stewart*, 121 F.3d 486, 496 (9th Cir.1997); *United States v. Drake*, 934 F.Supp. 953, 963 (N.D.Ill.1996).

Appellant's "outrageous government conduct" complaint with respect to the victim's questioning by the police is simply ignored by the majority opinion. Our case law and case law from the Supreme Court, as noted above, permit due process challenges to police investigations and prosecutions which shock the conscience of the court in terms of fundamental fairness. However, no legal authority has been cited to this Court which would permit an accused to make such a complaint based on the victim's mistreatment. The fact that police officers told the victim that they were conducting "a quality assurance review of the sick call records" rather than investigating professional misconduct by appellant is hardly outrageous government conduct within the context of the decisions cited above. *Cf. United States v. Lemaster, supra.*