**UNITED STATES, Appellee,**

v.

**Martez L. HENDERSON, Private First Class, U.S. Army, Appellant.**

No. 98–0847.
Crim.App. No. 9501435.

U.S. Court of Appeals for
the Armed Forces.

Argued May 12, 1999.

Decided Sept. 27, 1999.

SULLIVAN, J., delivered the opinion of the Court, in which COX, C.J., and CRAWFORD, GIERKE, and EFFRON, JJ., joined.

For Appellant: *Major Leslie A. Nepper* (argued); *Lieutenant Colonel Adele H. Odegard* and *Major Michael E. Hatch,* USAR (on brief); *Colonel John T. Phelps, II,* and *Major Holly S.G. Coffey.*

For Appellee: *Major Virginia G. Beakes,* USAR (argued); *Colonel Russell S. Estey,*

*Lieutenant Colonel Eugene R. Milhizer,* and *Major Patricia A. Ham* (on brief).

Judge SULLIVAN delivered the opinion of the Court.

Appellant was tried by a general court-martial composed of officer and enlisted members during the summer of 1995 at Mannheim and Bad Kreuznach, Germany. Contrary to his pleas, he was found guilty of the premeditated murder of Thomas Kreiz and the aggravated assault of Mr. Kreiz and Mario Massaro, in violation of Articles 118(1) and 128(b)(1) and (2), Uniform Code of Military Justice, 10 USC §§ 918(1) and 928(b)(1) and (2). On July 21, 1995, the members sentenced appellant to a dishonorable discharge, confinement for life, forfeiture of $300 pay per month for 14 months, reduction to pay grade E–1, and a reprimand.

On November 24, 1995, the convening authority reduced the finding of guilty of premeditated murder to a finding of guilty of unpremeditated murder in violation of Article 118(2). He also approved only so much of the adjudged sentence as provided for a dishonorable discharge, confinement for 60 years, forfeiture of $300 pay per month for 14 months, and reduction to E–1.

On November 18, 1997, a panel of the Court of Criminal Appeals further reduced the finding of guilty of unpremeditated murder to voluntary manslaughter, in violation of Article 119(a), UCMJ, 10 USC § 919(a), set aside the sentence, and authorized a rehearing on sentence. On January 20, 1998, the Government requested reconsideration by the panel or by the court *en banc.* On February 19, 1998, *en banc* reconsideration was denied. However, the panel agreed to reconsider its decision. On April 30, 1998, it issued a second decision which set aside its prior decision, affirmed findings of guilty to unpremeditated murder and the other offenses, and affirmed the sentence. 48 MJ 616 (1998).

On February 3, 1999, this Court granted review on the following issues of law:

I. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT'S RIGHTS BY DENYING APPELLANT'S MOTION TO SUPPRESS AND RECEIVING APPELLANT'S INVOLUNTARY STATEMENTS INTO EVIDENCE AND SUCH ERROR IS NOT HARMLESS BEYOND A REASONABLE DOUBT.

II. WHETHER THE EVIDENCE IS LEGALLY INSUFFICIENT TO FIND APPELLANT GUILTY OF UNPREMEDITATED MURDER.

III. WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT REVERSED ITS PREVIOUS FINDING THAT APPELLANT UNLAWFULLY KILLED THOMAS KREIZ IN THE HEAT OF PASSION CAUSED BY ADEQUATE PROVOCATION, IN VIOLATION OF ARTICLE 119(a), UCMJ.

IV. WHETHER THE ARMY COURT SIGNIFICANTLY ALTERED THE BURDEN OF PROOF NECESSARY TO PROVE THE OFFENSE OF UNPREMEDITATED MURDER.

We hold that the finding of guilty to unpremeditated murder should be affirmed.

The facts in this case as found by the Court of Criminal Appeals are fully reported in its decision of April 30, 1998. In pertinent part, it said:

The death of Mr. Kreiz and the wounding of Mr. Massaro resulted from a dispute over a taxicab that occurred at the bahnhof (train station) in Bad Kreuznach, Germany, Fasching night, 23 February 1995. Several hours before midnight on that date, after an afternoon and evening of dining and drinking, Mr. Kreiz and his party of five, composed of himself, his mother, two additional female friends, Ms. Iris Porth and Ms. Annabelle Kurz, and Mr. Massaro, apparently decided not to wait their turn in line at the bahnhof taxicab stand and entered the next taxi that arrived. Appellant, who is black, and his party of three, composed of himself, another black soldier named Coleman, and a caucasian German national named Krakowiki, were among several persons who took issue with Mr. Kreiz's going to the head of the line.

**16**

Krakowiki verbally protested and physically held the front passenger door of the taxi, preventing Mr. Kreiz from closing it. When Krakowiki assaulted Mr. Kreiz by kicking him once on the thigh, Mr. Kreiz exited the cab and swung his fist at Krakowiki. Krakowiki was not hit, but backed away and ultimately ran towards, and into, Schaefergasse alley. Mr. Kreiz gave chase. His mother and Mr. Massaro yelled at him to "Stop. Leave him alone. Let's go home. It's late." Appellant, Coleman, Mr. Massaro, and Ms. Porth all followed behind at various intervals and in some undetermined order.

However, by the time Mr. Massaro and Ms. Porth arrived at the scene, they saw Mr. Kreiz down on the ground with only appellant standing in very close proximity to him. It was obvious that Mr. Kreiz had been injured. Mr. Massaro got in between appellant and Mr. Kreiz. Unbeknownst to both Ms. Porth and Mr. Massaro, appellant had stabbed/cut Mr. Kreiz eight times, five of which were penetrating wounds. Mr. Massaro and Ms. Porth lifted Mr. Kreiz to his feet, and while supporting him between them, assisted him out of the alley and back to the bahnhof. As they were doing so, they were followed by men who were taunting them. It was at this time that Mr. Massaro was struck in the lower right portion of his back. Although he did not realize at the time that he had been stabbed, this became apparent shortly thereafter. When he was struck, he turned and saw appellant standing about three to six feet behind him, but he never saw a knife. After Mr. Kreiz was dragged/carried back to the front of the bahnhof by his two friends, he collapsed on the ground. While lying on the ground mortally wounded, he was kicked in the head and side by two individuals identified by witnesses as various combinations of appellant, Krakowiki, and Coleman.

Witnesses to the violent altercation notified the German police at the bahnhof. When the police responded, appellant and his companions fled the scene with the police in pursuit. After a lengthy foot chase, appellant was cornered and appre-

hended. He was taken into German police custody and transported back to the bahnhof where he was identified by the decedent's mother and Ms. Porth as one of Mr. Kreiz's assailants. He was then taken to the Bad Kreuznach main police station where he was detained for questioning.

After being advised of his rights against self-incrimination under both German law and Article 31, UCMJ, appellant waived those rights and, beginning at about 12:30 a.m. on the morning of 24 February 1995, was interrogated for approximately one and one-half hours by German police. Appellant steadfastly denied any involvement in the incident leading up to the death of Mr. Kreiz. At about 2:00 a.m., appellant indicated that he was tired and asked to continue the interview the next morning. The German police immediately complied with appellant's request and ceased all questioning. The occurrences that are the basis for appellant's sole assignment of error commenced at this time.

Special Agent Ernesto Panaligan, who was present as an observer, asked the head German investigator if he could talk to appellant in private and was permitted to do so. Special Agent Panaligan told appellant that "if he had nothing to do with the murder, he had nothing to worry about" and "that he should just tell the truth." Special Agent Panaligan also stated that he "was a representative of the U.S. Government and was present to help the appellant." Appellant did not respond immediately, but as SA Panaligan was about to leave the room, appellant waved him back into the room and asked about punishments if he were convicted. Special Agent Panaligan answered that punishment was up to the courts. Appellant then admitted that what he had told the German investigators was "not really what happened" and that he "wanted to tell the truth now."

Special Agent Panaligan left the room and returned with his supervisor, CID SA John Kampa. Upon entering the room, SA Kampa said to appellant, "I understand you have something to say." Appellant

replied that he did, but that "he needed a lawyer." Recognizing that appellant had invoked his right to counsel, SA Kampa indicated that he could not talk to appellant if the appellant wanted to talk to a lawyer first and started to leave the room. Appellant motioned him back and asked if he could make a statement at that time and talk to a lawyer "in the morning." Special Agent Kampa initially responded that that could not be done, but when appellant stated, "What? I can't have both?", SA Kampa inquired, "Do you want to talk now and you want a lawyer in the morning?" Appellant responded affirmatively.

*Thereafter, in the presence of German police and CID agents, the appellant admitted to stabbing Mr. Kreiz three or four times, purportedly in self-defense, as Mr. Kreiz was beating the appellant.* Appellant described his fear of great bodily injury and asserted that he "jabbed" Mr. Kreiz with his pocketknife in the side and back to get Mr. Kreiz to stop pummeling him.[10] This admission by appellant, that he had stabbed the decedent in the midst of an affray, was the only direct evidence linking appellant to the stabbing death of Mr. Kreiz. There was circumstantial evidence in the form of the victim's blood on the front of appellant's clothing, however, no witness saw appellant stab Mr. Kreiz, no knife was ever recovered, and the victim's blood was also found on Krakowiki's clothing.

---

10. Appellant also stated that he defended himself when Mr. Kreiz knocked him to the ground and struck him repeatedly in the face. According to appellant, when he was able to pull down Mr. Kreiz and roll over on top of him, Mr. Massaro joined in the melee, kicking appellant in the stomach and hitting him in the face. *Appellant finally pulled out his pocketknife to defend himself against both Mr. Kreiz and Mr. Massaro.* We have found that Mr. Massaro's only role in Schaefergasse alley was to separate appellant from Mr. Kreiz after Mr. Kreiz had been injured by appellant. Consequently, we find the appellant's statement to law enforcement authorities concerning the circumstances surrounding the stabbing to be incredible.

48 MJ at 617–19 (footnotes omitted except where noted) (emphasis added).

**I**

The first issue granted review asks whether the trial judge erred in denying appellant's motion to suppress his pretrial statement to Agent Kampa that he stabbed Mr. Kreiz with his pocketknife during the affray in the alley. The Court of Criminal Appeals points out that this was "the only direct evidence linking appellant to the stabbing death of Mr. Kriez," although circumstantial evidence on this point existed in the record. *Id.* at 619. Appellant submits

that a consideration of the totality of the circumstances, as called for by [*United States v.*] *Bubonics,* [40 MJ 734 (NMCMR 1994) ], reveals that all statements obtained and received into evidence against him at trial were involuntary in that they were obtained in violation of UCMJ art. 31, in violation of the self-incrimination privilege, in violation of the due process clause of the Fifth Amendment, and through the use of coercion, unlawful influence, or unlawful inducement.

Final Brief at 12.

▇ The first question we will address is whether Special Agent (SA) Panaligan's earlier conversation with appellant after he terminated his interview with German police investigators violated *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards* holds that a suspect in custody, who states his intention to exercise his right to counsel or silence, may not be interrogated by police until his lawyer is present or until he reinitiates discussions with police about the crime. *See Enoch v. Gramley,* 70 F.3d 1490, 1499–1500 (7th Cir. 1995). Appellant argues that SA Panaligan's advice to tell the truth if he was innocent was interrogation which violated the *Edwards* bright-line rule and tainted his later statement to SA Kampa admitting his stabbing of Mr. Kriez. *See Collazo v. Estelle,* 940 F.2d 411, 417–18 (9th Cir.1991). We disagree.

We note that the record in this case shows that appellant was arrested by German police and brought to a German police building. Both German and American authorities advised him of his rights, he waived those

rights, and German police conducted his questioning. He then admitted only to being a witness to the fight. After approximately 2 hours, appellant said that he was tired and indicated that he wanted to continue the questioning in the morning.

We are not convinced that *Edwards* applies in a situation involving interrogation conducted by a foreign Government. In any event, we find no violation of *Edwards* in SA Panaligan's continued encouragement of appellant to speak the truth. The record before us shows no unequivocal assertion by appellant .of his right to counsel or silence, which is required to invoke the *Miranda*[1]–*Edwards* bright-line rule against further police interrogation or its functional equivalent. *See Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Here, he simply indicated that he was tired of talking and wanted to continue the next day. Accordingly, this legal claim based on *Edwards* is without merit.

■ The next question we will address is whether SA Kampa's subsequent questioning of appellant violated *Edwards*. Appellant asserts that he "clearly and unequivocally requested a lawyer" after his conversation with SA Panaligan but before his admissions to Agent Kampa. The record shows, however, that appellant stated that he both wanted to talk to police "and" he wanted a lawyer. The record also shows that SA Kampa refused this request but acceded to appellant's second request to talk to them at that time and to see a lawyer in the morning. In our view, this was also a situation where appellant did not unequivocally exercise his right to counsel, and his actions were legally insufficient to invoke the protections of *Miranda* and *Edwards*. *See Davis v. United States, supra.*

■ The final question we will address regarding Issue I is whether all the circumstances of this case together show that appellant's will was overborne and his inculpatory admissions were involuntary. *See United States v. Bubonics*, 45 MJ 93–94 (1996). Appellant cites two Court of Criminal Appeals cases generally identifying factors pertaining to a voluntariness inquiry. *See United States v. Sojfer*, 47 MJ 425, 429–30 (1998)(our Court discussing the same factors). He then notes his purported 3–hour interrogation and the ambiguous role of Special Agents Panaligan and Kampa as representatives of the United States Government who were purportedly there to help him.

We review *de novo* the question of the voluntariness of a *Fulminante* confession. *See Bubonics, supra* at 94; *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). We agree with the appellate court below, however, that appellant's incriminatory admissions were entirely voluntary. The record shows that he couched these admissions in his exculpatory story of self-defense to military authorities in the hopes of avoiding his problems with the German Government. In these circumstances, we see no involuntariness. *See United States v. Washington*, 46 MJ 477, 482 (1997) (confession voluntary where record shows appellant tried to talk himself out of trouble).

## II

■ Appellant next complains that the evidence of record is legally insufficient to support his conviction for unpremeditated murder. He. argues that the prosecution introduced no evidence that he intended to kill or inflict great bodily harm on the victim, Mr. Kreiz. He further argues that the prosecution failed to prove that appellant did not act in the heat of passion due to adequate provocation. We will not relitigate this case at the appellate level, but instead limit ourselves to the question whether evidence was admitted in this case which would permit a reasonable person to find appellant guilty of unpremeditated murder. *See United States v. Pabon*, 42 MJ 404, 405 (1995), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Initially, we note that appellant, in a pretrial statement, admitted stabbing Mr. Kreiz numerous times. Other evidence was admitted that Mr. Kreiz was stabbed eight times,

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

one time in the heart and four other times in life-threatening locations, and Mr. Massaro was stabbed in the back as he was attempting to withdraw a badly wounded Mr. Kreiz from the alley. Evidence was also admitted that appellant kicked Mr. Kreiz in the head while he was lying wounded in his mother's arms outside the alley.

Proof that a person used a knife and that a death resulted therefrom has long been considered proof of an intent to kill or cause great bodily harm. *See United States v. Jackson,* 6 USCMA 193, 203, 19 CMR 319, 329 (1955); *United States v. Holsey,* 2 USCMA 554, 556–57, 10 CMR 52, 54–55 (1953). Moreover, proof of numerous wounds in lethal locations also reasonably suggests an intent to kill. *See United States v. Rodwell,* 20 MJ 264 (CMA 1985). Finally, we note that proof that appellant continued his assault on the victim, even while he lay helpless in the arms of others, surely would suggest to a reasonable person an intent to kill or inflict great bodily harm. *See United States v. Varraso,* 21 MJ 129, 134 (CMA 1985).

Admittedly, appellant's version of the events that evening, as reflected in his pretrial statement admitted as evidence in this case, is different. He basically asserts that he was being beaten by two Germans and struck out wildly with his pocketknife in fear and desperation in an effort to protect himself (heat of passion due to adequate provocation). The prosecution, however, was not required to introduce direct evidence contradicting the defense's evidence. It could and did introduce evidence relevant to appellant's credibility, *i.e.,* his flight from the scene of the crime and his smashing of his own face on his arrest. *See United States v. Williams,* 21 MJ 360, 362 (CMA 1986). Moreover, it could and did introduce evidence, which circumstantially contradicted appellant's version of the events that night, *i.e.,* testimony that appellant followed the victim and Krakowiki into the alley. *See generally United States v. Maxwell,* 38 MJ 148, 150–51 (CMA 1993) (the Government may meet its burden of proof with direct or circumstantial evidence). Viewing the record as a whole, we find that it contains legally sufficient evidence to support appellant's conviction for unpremeditated murder. *Cf. United States v. Cauley,* 45 MJ 353, 356 (1996) (we are not limited to appellant's narrow view of record on issue of lack of consent in rape case).

## III

The third issue before us is whether the panel of the Court of Criminal Appeals which decided appellant's case erred when it reversed itself and affirmed a finding of guilty to unpremeditated murder. In an earlier panel decision, it had set aside appellant's approved finding of guilty of unpremeditated murder and affirmed a finding of guilty to voluntary manslaughter. Before that, as noted above, appellant had been found guilty of premeditated murder, but the convening authority subsequently reduced this finding of guilty to unpremeditated murder.

Appellant argues that the panel of judges which set aside the decision of November 18, 1997, did so in violation of Article 66(a), UCMJ, 10 USC § 866(a), which states in pertinent part:

> Each Judge Advocate General shall establish a Court of Criminal Appeals which shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges. For the purpose of reviewing court-martial cases, the court may sit in panels or as a whole in accordance with rules prescribed under subsection (f). *Any decision of a panel may be reconsidered by the court sitting as a whole in accordance with such rules.*

(Emphasis added.) Appellant contends that the panel's earlier decision must stand unless it is set aside by the Court of Criminal Appeals sitting *en banc.* We disagree. *See generally United States v. Boudreaux,* 35 MJ 291, 296–97 (CMA 1992) (Sullivan, C.J., concurring in the result).

The plain language of the statute provides that "[a]ny decision of a panel *may* be reconsidered by the court sitting as a whole...." (Emphasis added.) It does not state that any decision of a panel *must* be reconsidered

by the court sitting as a whole. We presume that Congress is capable of saying what it means, and additional interpretation on our part, at least in this matter, is unnecessary. *See generally Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707, 1710, 143 L.Ed.2d 985 (1999); *United States v. Wells,* 519 U.S. 482, 490–91, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997).

In addition, subsections (a) and (f) of Article 66 expressly authorize the uniform rules of procedure prescribed by the Judge Advocates General. 44 MJ LXIII (effective May 1, 1996). Reconsideration of a decision by a Court of Criminal Appeals is provided for without regard to whether it is sitting as a panel or as a whole. *See* Rules 19 and 4; *cf.* Rule 17 (*en banc* proceedings). Finally, nothing in the legislative history of this codal provision has been called to our attention which expressly states that Congress intended to bar reconsideration by a panel. *See generally United States v. Solis,* 46 MJ 31, 33 (1997).

Finally, when Article 66 was first enacted, it directed each Judge Advocate General to "constitute in his office one or more boards of review." Each board of review was a separate entity. There was no provision for *en banc* proceedings. On several occasions, our Court recognized the inherent authority of a board of review to reconsider its own decisions. *See, e.g., United States v. Sparks,* 5 USCMA 453, 18 CMR 77 (1955); *United States v. Corbin,* 3 USCMA 99, 11 CMR 99 (1953); *United States v. Reeves,* 1 USCMA 388, 3 CMR 122 (1952). In *Reeves,* our Court stated that "boards of review must clothe themselves with some of the powers inherent in courts," including "the right to correct clerical errors, inadvertently entered decisions, and those decisions which are clearly wrong as a matter of law." *Id.* at 390–91, 3 CMR at 124–25.

When the Military Justice Act of 1968 replaced the boards of review with Courts of Military Review, Article 66 was amended to direct each Judge Advocate General to "establish a court of Military Review which shall be composed of one or more panels." Article 66 further provided that "the court may sit in panels or as a whole." 82 Stat. 1335. In *United States v. Chilcote,* 20 USCMA 283, 286, 43 CMR 123, 126 (1971), our Court reviewed the legislative history of Article 66 and concluded that Congress intended to replace the boards of review with "a single appellate body for the review of court-martial cases within each service." *Chilcote* held that Article 66 did not permit *en banc* reconsideration of a panel decision; it did not address the previously recognized authority of panels to reconsider their own decisions.

In the Military Justice Act of 1983, Article 66 was amended again to specifically overrule the *Chilcote* decision by adding the following sentence: "Any decision of a panel may be reconsidered by the court sitting as a whole in accordance with such rules." 97 Stat. 1402. *See United States v. Flowers,* 26 MJ 463, 464–65 (CMA 1988) (setting out legislative history).

The 1983 amendment relied on by appellant addressed only the question whether a majority of the court sitting *en banc* could reconsider a panel decision. It did not overrule our Court's earlier decisions recognizing a panel's inherent authority to reconsider its own decisions.

## IV

Appellant finally argues that the Court of Criminal Appeals erred in its second decision in this case by erroneously failing to require the prosecution to disprove that he acted in the heat of passion caused by adequate provocation. *See* Art. 119(a); para. 44c(1), Part IV, Manual for Courts–Martial, United States (1995 ed.).[2] *See generally Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). He implies that the appellate court erred in this regard because it accepted the Government's reconsideration argument that insufficient evidence of adequate provocation was admitted in this case. *See United States v. Maxie,* 9 USCMA 156, 25 CMR 418 (1958); *United States v. Roston,* 986 F.2d 1287, 1290 (9th Cir.1993). We re-

2. This provision is unchanged in the 1998 Manual.

ject appellant's "failure to alter the burden of proof" argument.

The Government, indeed, did argue that the burden to disprove heat of passion based on adequate provocation never shifted to the prosecution. It particularly argued that, "[i]n the instant case, the Army Court's factual determinations and the evidence in the record clearly establish that there is absolutely no evidence of adequate provocation." Moreover, it has continued to argue that its only burden was to "prove[ ] beyond a reasonable doubt that appellant intended to kill Mr. Kreiz." Answer to Final Brief at 54.

Turning to the appellate court's second opinion in this case, however, we are not persuaded that it accepted the Government's argument on this point. Its opinion certainly does not state that the prosecution had no burden to disprove heat of passion and adequate provocation. Instead, it said:

> In resolving legal sufficiency, this court is bound to "draw every reasonable inference from the evidence of record in favor of the prosecution," that the evidence establishes beyond a reasonable doubt that: (1) Thomas Kreiz is dead, (2) his death resulted from appellant's act of stabbing him with a knife, (3) the killing was unlawful, and (4) appellant, at the time of the killing, had the intent to kill or inflict great bodily harm. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Manual for Courts–Martial, United States (1995 ed.), Part IV, para. 43b(2) [hereinafter MCM]. The evidence meets this standard. *For factual sufficiency, the test is whether, after weighing the evidence of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt.* UCMJ, art. 66(c); *United States v. Turner*, 25 MJ 324, 325 (CMA 1987). *We have no difficulty concluding that the evidence establishes each of the elements of proof beyond a reasonable doubt.* We find that the evidence of record supports the conclusion of the members that the appellant is not entitled to the defense of self-defense. *See* RCM 916(e)(1). *Nor was the appellant provoked to such an extent that, in the heat of sudden passion caused by adequate provocation, a fatal blow was struck before self-control could return. See* MCM, Part IV, para. 44c(1)(a). *We also find that any provocation offered by Mr. Kreiz himself was insufficient to excite uncontrollable passion in a reasonable person.*

48 MJ at 620 (footnote omitted) (emphasis added).

In construing this language, we note that the members of appellant's court-martial were properly instructed that adequate provocation and heat of passion were factual issues in this case, upon which the prosecution carried the burden of proof. These circumstances distinguish appellant's case from *Maxie* and *Roston*, where it was held that evidence in the record was not sufficient to warrant the trial judge giving an instruction on manslaughter. Moreover, the service court's opinion does not purport to establish a rule of law that fisticuffs are never adequate provocation for the use of a knife. *Cf. Maxie, supra* at 161, 25 CMR at 423 ("Insulting or abusive words or gestures, taunts, a slight blow with the hand or fist are not, standing alone, considered adequate provocation."). Instead, expressly relying on its Article 66(c) factfinding powers, the service appellate court found that the provocation itself was insufficient. *See Mullaney*, 421 U.S. at 702, 95 S.Ct. 1881. While use of the word "insufficient" might suggest an evidentiary insufficiency holding, the lower court's opinion, viewed in its entirety, clearly indicated a factual finding of inadequate provocation. *Cf. United States v. Saulsberry*, 47 MJ 493, 495 (1998); *see generally* para. 44c(1)(b), Part IV, Manual, *supra* ("The provocation must be adequate to excite uncontrollable passion in a reasonable person[.]").

The decision of the United States Army Court of Criminal Appeals is affirmed.