**UNITED STATES**

v.

**Brian DEARING, Operations Specialist Seaman (E–3), U.S. Navy.**

**NMCCA 200100291.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 14 March 2000.

Decided 10 Feb. 2005.

Lt Rebecca Snyder, JAGC, USNR, Appellate Defense Counsel.

David P. Sheldon, Civilian Appellate Defense Counsel.

Lt Col John Kennedy, USMCR, Appellate Government Counsel.

Lt Frank L. Gatto, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Chief Judge, SCOVEL, and HARRIS, Appellate Military Judges.

HARRIS, Judge:

During January through March 2000, a general court-martial composed of officer and enlisted members tried and convicted the appellant, contrary to his pleas, of unpremeditated murder, assault with intent to inflict grievous bodily harm, assault with a dangerous weapon (knife), and obstruction of justice, in violation of Articles 118, 128, and 134, Uniform Code of Military Justice, 10 U.S.C.

§§ 918, 928, and 934. On 14 March 2000, the members sentenced the appellant to confinement for 25 years, reduction to pay grade E–1, total forfeiture of pay and allowances, and a dishonorable discharge. On 12 January 2001, the convening authority (CA) approved the sentence as adjudged.

This court has carefully examined the record of trial, all post-trial matters and allied papers, and all motions submitted to this court and their respective responses. We have also considered the five assignments of error submitted on behalf of the appellant by civilian appellate defense counsel (ADC), the appellant's six assignments of error explicitly and implicitly advanced pursuant to *United States v. Grostefon*, 12 M.J. 431, 436 (C.M.A. 1982), the Government's answers, and the excellent oral argument of counsel on 21 September 2004 addressing the assignment of error pertaining to civilian trial defense counsel's requested special self-defense instruction on escalation. We conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 USC §§ 859(a) and 866(c).

### Assignments of Error

The appellant, through counsel, raised the following assignments of error (AOEs):

I. WHETHER THE MILITARY JUDGE ERRED BY FAILING TO PROPERLY INSTRUCT THE PANEL REGARDING [THE] APPELLANT'S RIGHT TO EXERCISE SELF[-]DEFENSE DURING THE ALTERCATION WITH [MACHINIST'S MATE THIRD CLASS (MM3)] GLENZO TAYLOR.

II. WHETHER THE EVIDENCE IS FACTUALLY AND LEGALLY SUFFICIENT TO SUSTAIN [THE] APPELLANT'S CONVICTION FOR MURDERING [MM3] GLENZO TAYLOR AND FOR ASSAULTING [AVIATION ORDNANCEMAN AIRMAN (AOAN)] KENDRICK KEATON AND [MACHINIST'S MATE FIREMAN (MMFN)] LAWRENCE POLYDORE.

III. WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY FAILING TO GRANT A MISTRIAL WHEN THE PROSECUTOR ARGUED THAT [THE] APPELLANT'S SCHOOL RECORDS SHOULD BE CONSIDERED BY THE PANEL FOR AN IMPROPER PURPOSE.

IV. WHETHER [THE] APPELLANT'S RECORD OF TRIAL IS NOT SUBSTANTIALLY VERBATIM DUE TO THE GOVERNMENT'S LOSS OF TWO DOCUMENTS USED BY THE GOVERNMENT'S EXPERT WITNESSES DURING THEIR TESTIMONY.

V. WHETHER [THE] APPELLANT WAS PROVIDED A TIMELY POST–TRIAL AND APPELLATE REVIEW UNDER THE UNIFORM CODE OF MILITARY JUSTICE AND THE UNITED STATES CONSTITUTION.

The appellant explicitly and implicitly raised the following issues pursuant to *Grostefon*:

I. THE MILITARY JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF THE [APPELLANT], BY FAILING TO PROPERLY TAILOR THE INSTRUCTIONS TO THE COURT ON THE ISSUE OF ESCALATION OF FORCE AS IT PERTAINED TO THE [APPELLANT'S] RIGHT TO USE SELF–DEFENSE [—] EVEN AFTER THE MILITARY JUDGE REQUESTED A SAMPLE INSTRUCTION, IN WHICH THE DEFENSE PRESENTED [SIC]. THE DEFENSE THEN OBJECTED TO THE OMISSION OF THE REQUESTED INSTRUCTION.

II. THE CONVICTION WAS FACTUALLY AND LEGALLY INSUFFICIENT TO CONVICT [FOR THE] UNPREMEDITATED MURDER [OF MM3 GLENZO TAYLOR] AS A MATTER OF LAW BY THE STANDARDS SET FORTH IN THE MANUAL FOR COURT[S]-MARTIAL.

III. THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE [APPELLANT] COMMITTED THE OFFENSES RELATED TO THE STABBING OF MMFN LAWRENCE D. POLYDORE.

IV. THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE [APPELLANT] COMMITTED THE OFFENSES RELATED TO [AOAN] KENDRICK KEATON.

V. DEFENSE COUNSEL WAS INEFFECTIVE IN NOT BRINGING ALL RELEVANT DEFENSES THAT WOULD BE A COMPLETE DEFENSE FOR THE [APPELLANT], OF INVOLUNTARY INTOXICATION.

[VI. THE APPELLANT IS ENTITLED TO 175 DAYS OF CONFINEMENT CREDIT FOR THE 877 DAYS HE SPENT IN CONFINEMENT AT THE OLD U.S. MILITARY DISCIPLINARY BARRACKS (USDB).]

*Grostefon* Issue I will be addressed under AOE I above. *Grostefon* Issues II, III, and IV will be addressed under AOE II above.

### Background

On the night of 18 September 1999, the appellant, his girlfriend, Teresa Wilson, and two other friends, Fireman (FN) Anthony S. Taylor, U.S. Navy, and his wife, Jennifer Taylor, went to see a movie at the Norfolk, Virginia Naval Base movie theater. The appellant and his girlfriend went to the movie theater complex in the appellant's black Isuzu Amigo and the Taylor couple went separately in FN Taylor's black Dodge Avenger.

On that same evening, MM3 Taylor and some of his friends, Aviation Ordnanceman Airman Apprentice (AOAA) Eldridge J. Wells, Jr., U.S. Navy, AOAN Keaton, and MMFN Polydore and his date, Elizabeth Hargrave, saw the same movie at the same theater. AOAA Wells and MM3 Taylor went to the movie theater with AOAN Keaton in his black Honda Accord, which AOAA Wells drove, and MMFN Polydore and his date went separately in MMFN Polydore's tan Mazda Protégé. Electrician's Mate Third Class (EM3) Graham Charity, U.S. Navy, and his girlfriend, Aviation Storekeeper Third Class (AK3) Trisha Marshall, U.S. Navy, both friends of MMFN Polydore and MM3 Taylor, were picked up very near the movie theater by MMFN Polydore and his date, immediately after the movie ended.

After the movie, all these individuals left the theater in the same vehicles they arrived in, with the exception of EM3 Charity and AK3 Marshall. Very shortly thereafter, a deadly stabbing incident occurred between the two movie-going parties in the Navy Exchange parking lot near the movie theater.

As a result of what can only be described as a very brief "road rage" incident, partly fueled by alcohol, between some or all of the parties in the Dodge Avenger and the Honda Accord after leaving the movie theater parking lot, those parties shortly thereafter ended up in a verbal confrontation in the Navy Exchange parking lot. For whatever reason, the parties from both the Isuzu Amigo and the Mazda Protégé also pulled into the Navy Exchange parking lot immediately following the other two vehicles. After the dust settled, the appellant had stabbed MM3 Taylor to death, and both MMFN Polydore and AOAN Keaton had also been seriously stabbed.

### Special Defense Instruction

In the appellant's first AOE, he asserts that the military judge erred by failing to properly instruct the panel regarding his right to exercise self-defense during the altercation with the decedent, MM3 Glenzo Taylor. The appellant avers that this court should set aside the findings of guilty to Charge I and order a rehearing on sentencing only. We do not agree.

A military judge is required to give the court-martial members "appropriate instructions" on findings. RULE FOR COURTS-MARTIAL 920(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). These appropriate instructions necessarily include special defenses under R.C.M. 916, which may become at issue based on the facts of the particular case. R.C.M. 920(e)(3). This court examines a military judge's refusal to give a defense-requested instruction under a clear abuse of discretion standard. *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F.1996)(citing *United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A. 1993)). The appellant is correct in asserting

that when a reviewing court determines whether a military judge properly exercised discretion in refusing to give a defense-requested instruction, it "must *examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence.*" *Maxwell*, 45 M.J. at 424 (quoting *United States v. Snow*, 82 F.3d 935, 938–39 (10th Cir.1996) (emphasis added)). The question of whether a court-martial was properly instructed is a question of law, which we review *de novo. Id.*

This court's standard for the adequacy of instructions is whether the instructions as a whole provide "meaningful legal principles for the court-martial's consideration." *United States v. Peszynski*, 40 M.J. 874, 882 (N.M.C.M.R.1994)(citing *United States v. Truman*, 42 C.M.R. 106, 1970 WL 7011 (C.M.A.1970)). Further, our superior court has held that a military judge has an affirmative duty to instruct *sua sponte* on special defenses reasonably raised by the evidence. *United States v. McMonagle*, 38 M.J. 53, 58 (C.M.A.1993). The Court of Military Appeals has also held that "[t]he test whether a defense is reasonably raised is whether the record contains some evidence to which the military jury may attach credit if it so desires." *Id.* at 58 (quoting *United States v. Simmelkjaer*, 40 C.M.R. 118, 122, 1969 WL 6025 (C.M.A.1969)). Any doubt as to whether the evidence raises a special defense requiring an instruction should be resolved in favor of the accused. *See United States v. Steinruck*, 11 M.J. 322, 324 (C.M.A. 1981). Additionally, the duty to instruct arises whenever some evidence is presented raising a defense, and that evidence need not "be compelling or convincing beyond a reasonable doubt." *United States v. Jackson*, 12 M.J. 163, 166–67 (C.M.A.1981)(citing *United States v. Jackson*, 6 M.J. 261, 263 n. 3 (C.M.A.1979)). That evidence, however, must at least be sufficient to support the appellant's theory. *United States v. Neville*, 82 F.3d 750, 761 (7th Cir.1996)(citing *United States v. Howell*, 37 F.3d 1197, 1203 (7th Cir.1994)). Further, the Supreme Court has held, as a general proposition, that "a defendant is entitled to an instruction as to any recognized defense for which *there exists evi-*

dence *sufficient for a reasonable jury to find in his favor.*" *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)(emphasis added). Finally, our superior court has held that a military judge's denial of a defense-requested instruction is error where: "(1) the requested instruction is *correct;* (2) '[the instruction] is *not substantially covered* in the main charge; and (3) [the instruction] is on such a vital point in the case that *the failure to give it deprived [the accused ] of a defense or seriously impaired its effective presentation*[,]'" in effect, denying him a fair trial. *United States v. Poole*, 47 M.J. 17, 19 (C.A.A.F.1997)(quoting *Damatta–Olivera*, 37 M.J. at 478)(emphasis added).

During an Article 39(a), UCMJ, session on instructions, the military judge and the counsel for the parties discussed various evidentiary issues relating to the Charges and, in particular, the special defense of self-defense under R.C.M. 916(e). The civilian defense counsel requested a specific instruction regarding "escalation" as it pertains to self-defense. Record at 1800–04. Relying on *United States v. Cardwell*, 15 M.J. 124 (C.M.A.1983), the civilian defense counsel requested that the members be instructed that:

> Even if the accused was an aggressor, the accused is entitled to use self-defense, if the opposing party *escalated* the level of the *conflict.* Accordingly, even if the accused was the aggressor, if the opposing party *escalated* the *conflict* by placing the accused in reasonable fear that he was at risk of death or grievous bodily harm, the accused would then be entitled to use *deadly force* in self-defense.

Record at 1815 (emphasis added); Appellate Exhibit LXXXVI.

After considering the defense's proposed specific instruction pertaining to escalation, the military judge declined to give the instruction, concluding that the instructions that he had already prepared "*adequately cover the issue.*" Record at 1823 (emphasis added). The civilian defense counsel objected, contending that the military judge's instructions did not specifically refer to escalation at all and, in his opinion, misstated both

the facts and the law. Further, the civilian defense counsel argued that under the court's proposed instructions, if the appellant was found to be an aggressor, he would be precluded from having the right to use self-defense, regardless of the circumstances. *Id.* at 1823–24. Whereupon, the military judge stated that the key explanation in his instructions would cover the definition of "aggressor," and he trusted that "the members will carefully consider that definition and apply it in their deliberations. . . ." [1] *Id.* at 1824.

In his argument on the merits, the trial counsel referred to the "aggressor" portion of the self-defense instructions. *Id.* at 1850. The trial counsel then argued that the appellant became the aggressor when he stepped forward to defend Teresa Wilson after AOAN Keaton moved towards her to strike her (in response to her striking AOAN Keaton), and that the appellant also became the aggressor when he used "excessive force" by introducing a lethal (dangerous) weapon (the knife) into what was just, at that time, an ordinary fistfight. *Id.* at 1850. The trial counsel then argued that, "at the very least, the accused was a mutual combatant" who engaged in mutual combat as an aggressor and is thus "not entitled to self-defense. . . ." *Id.* at 1851. In his rebuttal argument, the trial counsel also contended, in part, that:

> When [the appellant] chose to join in on this fight [between Teresa Wilson and AOAN Keaton], he steps in[to] her shoes. He steps in[to] the shoes . . . of the person who threw the first punch, so when he steps in, he knows the odds, and he knows they're the aggressors, they're the bullies, they're the people who started it. That's how the law works. He has as much right to use self-defense as [Teresa] Wilson had, which is zip, because she started the fight. . . . When [the appellant] jumped into that fight you've got to expect to be hit.

*Id.* at 1878–79.

■ It is the appellant's position that "[t]he military judge's instruction and the

---

trial counsel's resulting argument are clear misstatements of the law." Appellant's Brief of 17 Oct 2003 at 56. The appellant is correct that "even a person who starts an affray is entitled to use self-defense when the opposing party escalates the level of the conflict." *Id.* at 57 (quoting *Cardwell*, 15 M.J. at 126 (internal quote omitted)). We recognize that even an aggressor can use the same or similar force in his own defense when his adversary escalates the conflict, just as he would be entitled to if he had withdrawn completely, provided that the force used is reasonable under the circumstances. *Cardwell*, 15 M.J. at 126.

■ When a person is assaulted, he is entitled to defend himself. However, if a person who is assaulted does defend himself, the force with which he responds must be reasonable under the circumstances. *United States v. Jackson*, 36 C.M.R. 101, 106, 1966 WL 4427 (C.M.A.1966). If a person who is assaulted defends himself with a force that is *not* reasonable under the circumstances, he has, in effect, *escalated* the situation such that he has become an aggressor. *United States v. Acosta–Vargas*, 32 C.M.R. 388, 392, 1962 WL 4507 (C.M.A.1962). However, the trial counsel, in effect, argued that based on the appellant's conduct that night, the evidence supports beyond a reasonable doubt that: (1) the appellant actually entered the confrontation as an aggressor already armed with a dangerous weapon and a willingness to use it; (2) the appellant used the dangerous weapon and was the only one who actually used deadly force; (3) the appellant's use of a dangerous weapon in applying deadly force was not in response to the escalation of the conflict by another mutual combatant or another aggressor's first use of deadly force; and, therefore, (4) the appellant must first have clearly withdrawn from his deadly aggression or any mutual combat before he would be cloaked with a special defense entitling him to defend himself with deadly force.[2]

---

1. The special defense of self-defense instructions with which the military judge charged the members are contained within Appendix A to this opinion. *See* Record at 1902–03; *see also* Appellate Exhibit LXXXVII at 10–11.

2. For applicable trial counsel arguments on the merits and in rebuttal, see Appendix B to this opinion.

■ It is the appellant's position that the evidence presented at trial supports the conclusion that "[MM3] Glenzo Taylor and his friends had *escalated* the confrontation once it had begun, ... [with the] [a]ppellant then act[ing] to protect himself from the application of the *deadly force* that was being applied [by MM3 Glenzo Taylor], ultimately stabbing [MM3] Glenzo Taylor twice, causing his death." Appellant's Brief of 17 Oct 2003 at 54 (emphasis added). The appellant's position concerning the use of deadly force in his right of self-defense is that he only responded twice with a knife, both responses being with deadly force in response to the alleged deadly force that was being applied by MM3 Glenzo Taylor. The appellant has never taken the position that he ever used deadly force in self-defense against either AOAN Keaton or MMFN Polydore in direct response to any form of alleged assault by either of them. In fact, the appellant's position has always been that while he did defend himself against alleged assaults by AOAN Keaton and MMFN Polydore, he did not use deadly force and cut or stab either of them, and that it must have been either Teresa Wilson or FN Anthony Taylor, or both of them, who had knives and used them, or who possibly used his "dropped" knife. We, therefore, only address this AOE as it pertains to Charge I, as the appellant correctly suggests.

We find that the defense-requested instruction was substantially covered in the main charge to the members. *Poole,* 47 M.J. at 19. Even if the defense-requested instruction had not been substantially covered in the main charge to the members, we conclude that the military judge's refusal to give the defense-requested instruction on escalation did not deny the appellant a fair trial by depriving him of a defense or seriously impairing its effective presentation, *id.,* because sufficient evidence did not exist for a reasonable jury to find in his favor.[3] *Mathews,* 485 U.S. at 63, 108 S.Ct. 883 (emphasis added); *see Maxwell,* 45 M.J. at 424. The civilian defense counsel ably argued the facts and the

theory of the appellant's case, to include his theory on self-defense.[4] As such, we decline to grant relief.

### Sufficiency of Evidence

■ In the appellant's second AOE, he asserts that the evidence is both factually and legally insufficient to sustain his conviction for murdering MM3 Glenzo Taylor and for assaulting both AOAN Kendrick Keaton and MMFN Lawrence Polydore. The appellant avers that this court should set aside the findings of guilty to Charges I and II and order a rehearing on sentence only. In the alternative, with regard to Charge I, the appellant avers that he should only be convicted of the lesser included offense of voluntary manslaughter, because the killing of MM3 Glenzo Taylor was done in the heat of sudden passion caused by adequate provocation. We do not agree.

A military Court of Criminal Appeals has an independent statutory obligation to review each case *de novo* for legal and factual sufficiency, and may substitute its own judgment for that of the trial court. Art. 66(c), UCMJ; *United States v. Turner,* 25 M.J. 324, 324–25 (C.M.A.1987). In doing so, this court's assessment of both legal and factual sufficiency is limited to only the evidence presented at trial. *United States v. Dykes,* 38 M.J. 270, 272 (C.M.A.1993).

The test for legal sufficiency is whether, considering the evidence admitted at trial in the light most favorable to the prosecution, a reasonable fact-finder could have found that all the essential elements were proven beyond a reasonable doubt. *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F.2000)(citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *United States v. Spann,* 48 M.J. 586, 588 (N.M.Ct. Crim.App.1998), *aff'd,* 51 M.J. 89 (C.A.A.F. 1999). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is convinced of the appellant's guilt

---

3. A military judge who denies a defense-proposed special instruction on this basis would be well-served to place on the record the reasons why sufficient evidence did not exist.

4. For applicable civilian defense counsel arguments on the merits, see Appendix C to this opinion.

beyond a reasonable doubt. *Reed,* 54 M.J. at 41; *Turner,* 25 M.J. at 325; *see* Art. 66(c), UCMJ. Reasonable doubt does not mean that the evidence contained in the record must be free from any and all conflict. *United States v. Reed,* 51 M.J. 559, 562 (N.M.Ct. Crim.App.1999), *aff'd,* 54 M.J. 37 (C.A.A.F. 2000). In exercising the duty imposed by this "awesome, plenary, *de novo* power," *United States v. Cole,* 31 M.J. 270, 272 (C.M.A.1990), this court may judge the credibility of witnesses, determine controverted questions of fact, and substitute its judgment for that of the military judge or court-martial members. Art. 66(c), UCMJ. Further, we may believe one part of a particular witness' testimony yet disbelieve another part. *United States v. Harris,* 8 M.J. 52, 59 (C.M.A. 1979); *see* Art. 66(c), UCMJ.

To support the appellant's conviction under Article 118, UCMJ, for the unpremeditated murder of MM3 Glenzo Taylor, the Government must establish the following four elements beyond a reasonable doubt:

(1) That MM3 Glenzo Taylor is dead;

(2) That his death resulted from the act or omission of the accused;

(3) That the killing was unlawful; and

(4) That, at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon a person.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 43b(2). Under these elements the term "intent" encompasses an inference that death or great bodily injury was intended where a person does an intentional act likely to result in death or great bodily injury. *Id.* at ¶ 43c(3)(a), in part. "The intent need not be directed toward the person killed, or exist for any particular time before commission of the act, or have previously existed at all. It is sufficient that it existed at the time of the act or omission. . . ." *Id.* The term "'[g]reat [(grievous)] bodily harm' means serious injury; it does not include minor injuries . . . but it does include *fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs, and other serious bodily injuries. . . .*" *Id.* at ¶ 43c(3)(b)(emphasis added). Our superior court has long held that the use of a knife to stab a person constitutes the use of "deadly force." *United States v. Regalado,* 33 C.M.R. 12, 16, 1963 WL 4805 (C.M.A.1963). Further, proof that an accused used a knife and that death directly resulted therefrom is considered proof of the accused's intent to kill or inflict great bodily harm. *United States v. Henderson,* 52 M.J. 14, 19 (C.A.A.F. 1999).

To support the appellant's conviction under Article 128, UCMJ, for the assault of MMFN Lawrence Polydore in which grievous bodily harm was intentionally inflicted, the Government must establish the following four elements beyond a reasonable doubt:

(1) That the accused assaulted MMFN Lawrence Polydore;

(2) That grievous bodily harm was thereby inflicted upon him;

(3) That the grievous bodily harm was done with unlawful force or violence; and

(4) That the accused, at the time, had the specific intent to inflict grievous bodily harm.

MCM, Part IV, ¶ 54b(4)(b). An inference can be drawn that grievous bodily harm was intended when that harm is inflicted by a means of intentionally using force in a manner likely to achieve that result. *Id.* at ¶ 54c(4)(b)(ii), in part.

To support the appellant's conviction under Article 128, UCMJ, for assaulting AOAN Kendrick Keaton with a dangerous weapon, the Government must establish the following four elements beyond a reasonable doubt:

(1) That the accused attempted to do, offered to do, or did bodily harm to AOAN Kendrick Keaton;

(2) That the accused did so with a certain weapon, means, or force;

(3) That the attempt, offer, or bodily harm was done with unlawful force or violence; and

(4) That the weapon, means, or force was used in a manner likely to produce death or grievous bodily harm.

*Id.* at ¶ 54b(4)(a). "A weapon is dangerous when used in a manner likely to produce death or grievous bodily harm." *Id.* at ¶ 54c(4)(a)(i). However, to prove the offense

of assault with a dangerous weapon or means likely to produce death or grievous bodily harm, it is not necessary that death or grievous bodily harm be actually inflicted. *Id.* at ¶ 54c(4)(a)(iv).

We have carefully examined all of the evidence admitted on the merits. We conclude that the evidence is both legally and factually sufficient. We are, therefore, convinced beyond a reasonable doubt that the appellant is guilty of each of these offenses as found by the court-martial. We, therefore, decline to grant relief.

### Improper Argument of Government Counsel

In the appellant's third AOE, he asserts that the military judge abused his discretion by failing to grant a defense motion for mistrial when the prosecutor argued that the members should consider the appellant's school records for an improper purpose. The appellant avers that this court should set aside the findings and the sentence and authorize a rehearing. We disagree.

■■■ This court reviews a military judge's ruling on a motion for mistrial under an abuse of discretion standard. *United States v. Dancy*, 38 M.J. 1, 6 (C.M.A.1993). We also review a military judge's ruling on whether counsel has exceeded the permissible scope of argument on findings, as set forth in R.C.M. 919(b), and on presentencing, as set forth in R.C.M. 1001(g), under an abuse of discretion standard. *United States v. Warner*, 59 M.J. 573, 583 (A.F.Ct.Crim. App.2003), *rev. granted*, 60 M.J. 124 (C.A.A.F.2004). Further, the power to grant a motion for mistrial should only be used by the military judge with "great caution, under urgent circumstances, and for plain and obvious reasons." *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F.2003)(quoting R.C.M. 915(a), Discussion). Moreover, a mistrial is a most unusual and disfavored remedy that should be used only as a last resort to protect the guarantee for a fundamentally fair trial. *Id.* And of significant importance, a military judge exercises considerable latitude in determining when to grant a motion for mistrial. *Id.*

■■■ During the trial counsel's cross-examination of the appellant, he asked the appellant about Prosecution Exhibit 46 For Identification (PE 46), an induction form that the appellant completed when he was being processed into pretrial confinement. Record at 1621–24; PE 46. When the civilian defense counsel objected to the admission of PE 46, the military judge excused the members and he and counsel adjourned to an R.C.M. 802 conference. During the R.C.M. 802 conference, the trial counsel informed the military judge that he intended to question the appellant about the appellant's written response to a question found on page 3 of PE 46: "Were you ever suspended or expelled [from school]?" and "Reason(s)[?]" The written responses provided by the appellant to the questions were: "Yes" and "to[o] many points of being late, write ups, talking back[.]" PE 46. The trial counsel also indicated that he was offering PE 46 as impeachment under MILITARY RULE OF EVIDENCE 608(b) & (c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), because the Government believed the appellant had actually been suspended from high school for possessing a "box cutter" blade, and not for what he listed in his answer. Appellate Exhibit LXXXI. The trial counsel was of the opinion that this was relevant to the appellant's truthfulness and his desire to minimize his criminal background upon entry into the brig at the time of the murder investigation (bias). *Id.* The appellant's civilian defense counsel contended that this document constituted improper extrinsic evidence. *Id.* The military judge sustained the civilian defense counsel's objection, ruling that the appellant could be cross-examined on the question and answer contained in PE 46, but that, under MIL. R. EVID. 403, the document itself could not be introduced. Record at 1626.

The trial counsel then asked the appellant about his answer to the pretrial confinement induction questionnaire and about his high school records, which allegedly showed that he was suspended for possessing a "dangerous weapon." *Id.* at 1630–31; Appellate Exhibit LXXXII. The appellant responded that his school records were inaccurate, that he had possessed a box cutter, and that he was "not suspended" for it, but instead he re-

ceived an in-school suspension. Record at 1631–33, 1745–48.

During an Article 39a, UCMJ, session on instructions, the military judge stated that he would provide the members with a "limiting instruction" on the issue of the appellant being "suspended from school for possession of a dangerous weapon." *Id.* at 1786–88. Upon the civilian defense counsel's objection to the substance of that particular limiting instruction, the military judge modified the instruction, whereupon the civilian defense counsel indicated that there was no further objection to the limiting instruction. *Id.* at 1813; Appellate Exhibit LXXXVII at 15.

During final argument on the merits of his case, the trial counsel argued:

Is the accused credible where he's portrayed as the mild-mannered nice peace-making guy? Well, we know on those Brig forms, and all we brought out was *he had a dangerous weapon in school and he lied about it,* right, because he was scamming in the Brig. He didn't want the prosecutors to know he's got dangerous weapons and blades in his background, so he scammed us at the Brig. Then [the civilian defense counsel] brings out, "But that's what got him the 70 points. *That was the ultimate one that got him kicked out. It was all those disruptions, disrespects, creating a disturbance,* it's those other 60 points he earned [*that got him suspended*]." Is that the mild-mannered peaceful guy he's been portrayed as? Look at his high school record ...

Record at 1881 (emphasis added). The appellant's civilian defense counsel objected, in part, to the trial counsel's argument regarding these records, contending that it was an improper use of these records to rebut a conclusion that the appellant was a peaceful person even though the defense had not put on such a defense. *Id.* at 1887–89. The trial counsel reasoned that the defense raised the "peacefulness" of the appellant during the testimony of Information Systems Technician Third Class Terrence Woodson, U.S. Navy, who had testified that the appellant is a "laid back" type of guy (Record at 689). *Id.* at 1889. The trial counsel also reasoned that the defense subsequently opened the door when it brought out the school records, thereby making it "fair game" for the Government to use the school records for this purpose. *Id.* The defense then asked for a mistrial, or that the military judge give a curative instruction that the panel must totally disregard the prosecutor's comments. *Id.* at 1889–90. The military judge denied both the motion for mistrial and the request for a curative instruction, holding that his instructions were adequate. *Id.* at 1890.

The members were then instructed that:

The evidence that the accused was suspended from high school for possession of a weapon such as a box cutter or other blade may be considered by you for the limited purpose of its tendency, if any, to weaken the credibility of the accused as a witness. You may not consider this evidence for any other purpose, and you may not conclude from this evidence that the accused is a bad person or has criminal tendencies and that he therefore committed the offenses charged.

*Id.* at 1907.

We conclude that the record simply does not support the appellant's claim that the military judge abused his discretion in not granting the defense motion for a mistrial. We further conclude that the military judge did not abuse his discretion when he denied the civilian defense counsel's request for a curative instruction. And even if the military judge's ruling constituted error, there is no showing that the error materially prejudiced a substantial right of the appellant. *United States v. Reist,* 50 M.J. 108, 110 (C.A.A.F.1999)(citing *United States v. Powell,* 49 M.J. 460, 465 (C.A.A.F.1998)). We, therefore, decline to grant relief.

### Record of Trial Not Verbatim

In the appellant's fourth AOE, he asserts that his record of trial is not substantially verbatim due to the Government's loss of two "documents" used by the Government's expert witnesses during their testimony. The appellant avers that this court should only approve a sentence of 6 months confinement and order his immediate release from confinement. We disagree.

■ A complete record of the proceedings and testimony must be prepared for each general court-martial resulting in an adjudged sentence which includes "death, a dismissal, a discharge, or (if the sentence adjudged does not include a discharge) any other punishment which exceeds that which may otherwise be adjudged by a special court-martial[.]" Art. 54(c)(1)(A), UCMJ, 10 U.S.C. §854(c)(1)(A). A verbatim transcript includes all proceedings, including sidebar conferences, arguments of counsel, rulings and instructions by the military judge, and matters which the military judge orders stricken from the record or disregarded. R.C.M. 1103(b)(2), Discussion. Even so, a "complete record" of trial is not necessarily a "verbatim record." *United States v. McCullah*, 11 M.J. 234, 236 (C.M.A.1981)(quoting *United States v. Whitman*, 11 C.M.R. 179, 181, 1953 WL 2000 (C.M.A.1953)). To be complete, the record of trial must include "[e]xhibits, or, with the permission of the military judge, copies, photographs, or descriptions of any exhibits which were *received in evidence . . . .*" R.C.M. 1103(b)(2)(D)(v)(emphasis added). Technical violations of R.C.M. 1103(b)(2) do not require reversal in every case; rather, an incomplete or nonverbatim record only raises a rebuttable presumption of prejudice. *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F.1999); *see also United States v. Santoro*, 46 M.J. 344, 346 (C.A.A.F.1997).

■ Whether a record of trial is incomplete is a question of law, which we review *de novo*. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F.2000). A transcript without a charge sheet, convening order, and sentencing exhibits is not complete. *Santoro*, 46 M.J. at 346 (citing R.C.M. 1103(b)(2)(D)). Further, a single missing prosecution exhibit can render the record incomplete, if it is of sufficient import to the findings in a contested case. *See McCullah*, 11 M.J. at 237–38. Whether an omission is substantial can be a question of quality as well as quantity. *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A.1982). What constitutes a *substantial omission*, however, must be approached by this court on a case-by-case basis. *Abrams*, 50 M.J. at 363.

■ The appellant asserts that slides used as demonstrative exhibits and not offered or admitted as evidence and charts that were not offered or admitted as evidence, each of which were used by trial counsel during questioning of Government expert witnesses, are now missing from the record of trial. Appellant's Brief of 17 Oct 2003 at 80–81. Neither the slides nor the charts were appended to the record as an appellate exhibit. The appellant opines that this court cannot "conduct an Article 66(c) review with them missing." *Id.* at 83. The Government acknowledges that these items "should have been attached to the record [of trial,] but are **not** part of the verbatim transcript or other items required to make the record complete." Government's Answer of 15 Jan 2004 at 6 (emphasis in original). The Government further acknowledges that any exhibits referred to on the record but not received into evidence should have been attached to the record as appellate exhibits. *Id.;* see R.C.M. 1103(b)(3)(B). Nonetheless, by comparison, we find that both of these omissions from the appellant's record of trial are relatively minor. When items described in R.C.M. 1103(b)(3) are not attached to the record of trial, this omission does not automatically render that record of trial nonverbatim. *United States v. Blaine*, 50 M.J. 854, 856 (N.M.Ct.Crim.App.1999).

■ We need not determine whether the appellant's record of trial is "substantially verbatim," however, because we are convinced that, even if the appellant's record of trial is incomplete, the Government has successfully rebutted the resulting presumption of prejudice. *See Santoro*, 46 M.J. at 347. Further, the appellant has not explained what, if any, prejudice he has suffered by the fact that the slides and charts were not appended to the record of trial. Considering the record of trial as a whole, we find no possibility of prejudice resulting from the Government's loss of the slides and charts used by the Government's expert witnesses during their testimony, or the failure to have them attached to the record of trial as appellate exhibits. We find that the record contains a sufficient description of the slides and charts to permit us to determine whether the

absence of such matter from the record of trial could have materially prejudiced the substantial rights of the appellant at trial. Record at 580–97,[5] 1144–47;[6] *see United States v. Williams,* 14 M.J. 796, 798 (A.F.C.M.R.1982). Finding no material prejudice, we decline to grant relief.

## Post–Trial Processing Delay

In the appellant's fifth AOE, he asserts that he was not provided timely post-trial and appellate review under the UCMJ and the United States Constitution. The appellant avers that this court should set aside the findings and the sentence. In the alternative, the appellant avers that this court should order additional two-for-one sentence credit for the 1304 days he has spent in confinement without any "institutional vigilance" over the processing of his appeal, in violation of his constitutional and statutory rights. We disagree.

The chronological history of the appellant's case follows. On 14 March 2000 (Day Zero), the members sentenced the appellant. On 9 November 2000 (Day 240), the staff judge advocate (SJA) completed his recommendation (SJAR) on the appellant's eight-volume, 1963–page record of trial. On 25 November 2000 (Day 256), the appellant submitted post-trial matters for the CA's consideration. On 14 December 2000 (Day 275), the SJA issued an addendum to his SJAR addressing the appellant's post-trial matters. On 12 January 2001 (Day 304), the CA took his action in the appellant's case. On 7 February 2001 (Day 330), this court received and docketed the appellant's case for appellate review.

After the appellant's record was docketed with this court, it remained with either his original or substitute ADC until 6 February 2003 (Day 1059), when his substitute ADC filed the twenty-first motion for enlargement of time in the appellant's case. This court granted that motion, but held that if the substitute ADC failed to file a brief on behalf of the appellant on or before 14 March 2003

(Day 1095), this court would nonetheless conduct its Article 66(c), UCMJ, review of the appellant's case. On 18 April 2003 (Day 1130), the appellant's substitute ADC filed the appellant's *Grostefon* issues brief, raising the above six explicit and implicit issues. On 18 July 2003 (Day 1222), the Government responded to the appellant's *Grostefon* issues brief. The appellant subsequently hired a civilian ADC. The appellant's civilian ADC filed his brief on behalf of the appellant on 17 October 2003 (Day 1313). On 15 January 2004 (Day 1402), the Government filed its answer to the appellant's brief and assignments of error.

■ In his assignment of error, the appellant asserts prejudice based on the delay that has already occurred, resulting in the appellant being "deprived of his right to a full, fair and timely review of his findings and sentence under Article 66 and the Due Process Clause." Appellant's Brief of 17 Oct 2003 at 86. Without question, an appellant has the right to a timely review of both the findings and the sentence of his court-martial. *United States v. Tardif,* 57 M.J. 219, 222 (C.A.A.F.2002); *United States v. Khamsouk,* 58 M.J. 560, 561 (N.M.Ct.Crim.App. 2003) (citing *United States v. Williams,* 55 M.J. 302, 305 (C.A.A.F.2001), *cert. denied,* 534 U.S. 1169, 122 S.Ct. 1189, 152 L.Ed.2d 129 (2002)). Normally, before an appellant will be afforded relief stemming from a claimed denial of speedy review, the appellant "must demonstrate some real harm or legal prejudice flowing from that delay." *United States v. Bell,* 46 M.J. 351, 353 (C.A.A.F.1997)(quoting *United States v. Jenkins,* 38 M.J. 287, 288 (C.M.A.1993)).

■ Nonetheless, even without a particular showing of prejudice, where the post-trial delay has been "excessive," our superior court has expressly held that we may grant relief "without a showing of 'actual prejudice' within the meaning of Article 59(a), if [we] deem[ ] relief appropriate under the circum-

---

5. Trial counsel's use of charts to both explain Doctor Leah L.E. Bush, Assistant Chief Medical Examiner, preceding expert testimony and to draw out and explain additional expert testimony on MM3 Glenzo Taylor's cause of death.

6. Trial counsel's use of slides to explain Special Agent Michael S. Maloney, Naval Criminal Investigative Service, previous testimony on the conduct of the crime scene investigation.

stances." *Tardif,* 57 M.J. at 224. As this court recently emphasized in *United States v. Bell,* 60 M.J. 682 (N.M.Ct.Crim.App.2004), we have been cautioned by our superior court to " 'be vigilant in finding prejudice wherever lengthy post-trial delay in review by a[CA] is involved.' " *Bell,* 60 M.J. at 685 (quoting *United States v. Johnson,* 10 M.J. 213, 218 (C.M.A.1981)(Everett, C.J., concurring in the result)).

■■■ The manner in which an allegation of a denial of speedy review is addressed by military Courts of Criminal Appeals is contained in *Tardif. Tardif,* 57 M.J. at 223–25. As our superior court stated, "counsel at the trial level are particularly well-situated to protect the interests of their clients" concerning post-trial matters pertaining to delay. *Id.* at 225. This court also recognized in *Bell* that the "essence of post-trial practice is basic fair play. . . ." *Bell,* 60 M.J. at 685 (quoting *United States v. Lowe,* 58 M.J. 261, 263 (C.A.A.F.2003)(internal quote omitted)). The appellant's civilian trial defense counsel submitted detailed post-trial matters and response to the SJAR on behalf of the appellant, in which he raised no issue of delay prior to the CA's acting on the appellant's case. Further, the appellant's case was expeditiously received by this court and immediately docketed for appellate review, with the record provided to the appellant's original ADC. As such, we find no prejudice to the appellant concerning the post-trial handling of his case prior to being received by this court and docketed for appellate review. We also conclude that the delay prior to the CA's action, standing alone, was not so extraordinary as to warrant the exercise of our Article 66(c), UCMJ, powers.

As this court very recently expressed,

[We enjoy] *fact-finding powers* under Article 66(c), UCMJ, which very few appellate courts possess and which require a thorough *review of the entire record* by a panel of this court. Our power to protect the rights of an accused has been compared to that of the "proverbial 800–pound gorilla." *United States v. Parker,* 36 M.J. 269, 271 (C.M.A.1993). With that power comes the responsibility to perform the "awesome, plenary, *de novo*" *review* to which the ap-

pellant is entitled by law. *United States v. Cole,* 31 M.J. 270, 272 (C.M.A.1990).

*United States v. Toohey,* 60 M.J. 703, 708 (N.M.Ct.Crim.App.2004)(emphasis added). Coupled with this court's exercise of its fact-finding powers is the court's recognition that an appellant also has the right to timely post-trial review of his or her case under Article 66(c), UCMJ. *Williams,* 55 M.J. at 305.

This court received and docketed the appellant's case not quite three years ago. The parties completed all the necessary pleadings and the case was submitted to this panel for decision by 29 January 2004. The preparation of the necessary pleadings for appellate review in this case has taken longer, as a general rule, than review of a court-martial of this length and complexity should normally take. As such, this court initially denied additional requests for enlargements of time beyond the twenty-first request for enlargement of time. Nonetheless, despite the appellant's complaint that length of time, standing alone, is sufficient to warrant relief, we do not find a lack of diligence in the post-trial processing of this case. The appellant has not alleged, nor do we find, any indication of deliberate or malicious intent as a reason for the delay in this case. *Toohey,* 60 M.J. at 708.

While we do not condone the length of delay in this case, we conclude that there is nothing so extraordinary about this case that merits the exercise of our Article 66(c), UCMJ powers. *Id.* Relief pursuant to Article 66(c), UCMJ, should only be granted under the most extraordinary of circumstances. *See generally* Art. 59(a), UCMJ. Accordingly, we decline to grant relief.

### Effective Assistance of Counsel

In the appellant's fifth issue submitted pursuant to *Grostefon,* he asserts that his trial defense counsel were ineffective in not bringing all relevant defenses that would be a complete defense for him, in particular, the affirmative defense of involuntary intoxication. The appellant opines that the affirmative defense of involuntary intoxication would have relieved him of any culpability for his actions, were the members given the opportunity to decide the issue. The appel-

lant avers that this court should order a fact-finding hearing to be conducted under *United States v. DuBay*, 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967). We disagree.

 We presume the competence of trial defense counsel, both military and civilian. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A.1987). To rebut the presumption of competence of trial defense counsel, the appellant is required to point to specific errors committed by his trial defense counsel, which, under prevailing professional norms, were unreasonable. *Id.* Further, the appellant must establish a factual foundation for a claim that his trial defense counsel's representation was ineffective. *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F.2000). An appellant's sweeping, generalized accusations will not suffice. *Id.*

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the standard for reviewing claims of ineffective assistance of (trial) defense counsel on appeal. The Court declared that:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052. These same standards are equally applicable before this court. *Scott*, 24 M.J. at 188. Moreover, in *Strickland*, the Supreme Court reasoned, that:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess

counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

466 U.S. at 689, 104 S.Ct. 2052. Further, we review allegations of ineffective assistance of counsel, *de novo*. *United States v. McClain*, 50 M.J. 483, 487 (C.A.A.F.1999).

 In order to show ineffective assistance of trial defense counsel, an appellant "must surmount a very high hurdle." *United States v. Smith*, 48 M.J. 136, 137 (C.A.A.F.1998)(citing *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F.1997)). When viewing tactical decisions by (trial) defense counsel, the test is whether such tactics were unreasonable under prevailing professional norms. *United States v. Cronic*, 466 U.S. 648, 666, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). It is strongly presumed that (trial) defense counsel is competent in the performance of representational duties. *Id.* at 658, 104 S.Ct. 2039. "Acts or omissions that fall within a broad range of reasonable approaches do not constitute a deficiency." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F.2001). Further, we also "strongly presume that [trial defense] counsel has provided 'adequate assistance.'" *United States v. Russell*, 48 M.J. 139, 140 (C.A.A.F.1998)(quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). Lastly, similar standards are set forth in *United States v. Polk*, 32 M.J. 150 (C.M.A.1991). *Polk*, however, makes clear that the appellant cannot overcome the presumption unless he can show that, absent the ineffective assistance of his trial defense counsel, there would have been a reasonable doubt respecting guilt. *Id.* at 153.

Our superior court has held that trial defense "[c]ounsel have a duty to perform a reasonable investigation or make a determination that an avenue of investigation is unnecessary." *United States v. Sales*, 56 M.J. 255, 258 (C.A.A.F.2002)(citing *United States v. Brownfield*, 52 M.J. 40, 42 (C.A.A.F.1999)). Further, "[w]e do not look at the success of a [ ] trial theory, but rather whether [trial de-

fense] counsel made an objectively reasonable choice in strategy from the alternatives available at the time." *Dewrell*, 55 M.J. at 136 (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F.Ct.Crim.App.1998)(internal citation omitted)). Also, "where the alleged error of [trial defense] counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *United States v. Ginn*, 47 M.J. 236, 247 (C.A.A.F.1997)(citing *Evans v. Meyer*, 742 F.2d 371, 375 (7th Cir.1984)). We note that we have absolutely no evidence before us to suggest that the appellant's trial defense counsel failed to properly investigate the circumstances surrounding the appellant's alleged involuntary intoxication as the result of his use of a prescribed controlled substance.

■ However, this court need not reach the question of deficient representation if we can first determine a lack of prejudice. *United States v. Quick*, 59 M.J. 383, 386 (C.A.A.F.2004); *United States v. Adams*, 59 M.J. 367, 371 (C.A.A.F.2004). In order to constitute prejudicial error, the appellant's trial defense counsel's deficient performance must render the result of the proceeding "unreliable" or "fundamentally unfair." *See United States v. Ingham*, 42 M.J. 218, 223 (C.A.A.F.1995)(quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)). We do not believe that the trial defense counsel's actions in the appellant's case, even if questionable in some respects, rise to this level.

■ In support of his allegation of ineffective assistance of counsel, the appellant offers that he was placed on limited duty and prescribed a mind-altering central nervous system (CNS) stimulant known as "Cylert" after being diagnosed with narcolepsy, "chronic fatigue syndrome," muscular wasting, and joint pain. Appellant's *Grostefon* Issues of 18 Apr 2003 at 59-60. The appellant avers that the *Physician's Desk Reference*[7] (PDR) reports the following CNS ef-

fects, among others, with the use of Cylert: convulsive seizures; precipitated attacks of "Tourette's syndrome;" hallucinations; mild depression; dizziness; increased irritability; headache; drowsiness; mood changes; lack of coordination; and increased heart rate. *Id.* at 60. The appellant opines that, during the fight, all these things played a large role in his "reaction time" and "actual mind set" as to whether he "actually feared death or grievous bodily harm, during the fight to entitle him to use self-defense." *Id.* We interpret the appellant's assertion to actually mean that, during the fight, all these things played a large role in his "reaction time" and "actual mind set" as to whether he "actually feared death or grievous bodily harm, during the fight [entitling him to be *excused* for his conduct, which included the use of deadly force, while under the effects of the controlled substance, Cylert]." *Id.* (emphasis added).

We reject the appellant's contention that his trial defense counsel were ineffective because they should have explored more closely the affirmative defense of involuntary intoxication over voluntary intoxication. On cross-examination by the trial counsel, the appellant was asked and he responded:

Q: Okay. Issue came up in this trial about medications, right?

A: Yes, sir.

Q: And, you have been on some medications for narcolepsy, that sort of thing?

A: Yes, sir.

Q: And a thyroid condition?

A: Yes, sir.

Q: Do you think that in any way, in any way, impacts what happened in the NEX parking lot on the night of 18 September [1999]?

A: I don't know, I'm not a doctor, sir. I couldn't tell.

Q: But even you know your own body than a doctor (sic). You were there, you knew how you were feeling. I'm asking you, based on what you knew and based on

---

7. The PDR is owned by Medical Economics. "The Essential Guide to Psychiatric Drugs" is published by St. Martin's Press.

what you were feeling, did your medical condition affect you in any way in that parking lot?

A: *No, my fear affected me, of being scared for my life. That's what affected me the most.*

Record at 1640–41 (emphasis added).

In conclusion, we do not find deficient representation of trial defense counsel under the *Strickland* standard. To the contrary, trial defense counsel effectively defended the appellant at trial on all charges. To the extent that trial defense counsel did not raise or more closely investigate the appellant's involuntary intoxication theory, we find no prejudice. As such, we conclude that a *DuBay* fact-finding hearing is not required and decline to grant any other relief.

### Confinement Credit

In the appellant's implicit sixth issue submitted pursuant to *Grostefon*, he asserts that he is entitled to 175 days of confinement credit for the 877 days he spent in confinement at the old USDB. The appellant avers, in effect, that, because a general court-martial military judge granted confinement credit to an accused in a totally unrelated case as a result of confinement conditions at the old USDB, the decision of that military judge is binding on this court; and, that we should grant relief to the appellant. We disagree.

 Article 55, UCMJ, pertaining to cruel and unusual punishment, states:

Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by a court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited.

We review *de novo* the implicit issue of whether the appellant has been punished in violation of Article 55, UCMJ, or the Eighth Amendment to the U.S. Constitution. *United States v. Smith*, 56 M.J. 290, 292 (C.A.A.F.2002) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F.2001)).

Generally, military courts look to federal case law interpreting the Eighth Amendment to decide claims of an Article 55, UCMJ, violation. *Id.; see also United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F.2000). As such, we will consider that the appellant is claiming both an Eighth Amendment violation and an Article 55, UCMJ, violation.

 Our superior court has held that this court has jurisdiction to determine on direct appeal whether the adjudged and approved sentence is being executed in a manner that offends the Eighth Amendment or Article 55, UCMJ. *White*, 54 M.J. at 472. An appellant who asks this court to review prison conditions must establish a "clear record demonstrating both the legal deficiency in administration of the prison and the jurisdictional basis for action." *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F.1997). However, before being entitled to relief based on a claim of unlawful punishment, an appellant must demonstrate, absent some unusual or egregious circumstance, that he has exhausted all administrative remedies available, including the prisoner grievance system and the complaint process under Article 138, UCMJ. *White*, 54 M.J. at 472.

We find that the appellant has neither made nor attempted such a showing. The appellant has failed the exhaustion requirement, which exists to encourage the resolution of these issues early and to develop an adequate record upon which reviewing authorities can rely. *See Miller*, 46 M.J. at 250. Further, the appellant's imprudent attempt to base his aforementioned arguments entirely upon a general court-martial trial judge's decision on a pretrial motion for appropriate relief in an unrelated case as if this were authority that would implicitly bind this court or our superior court, is not well-received.[8] We decline to grant relief.

### Conclusion

Accordingly, we affirm the findings and the sentence, as approved by the convening authority.

Chief Judge DORMAN and Judge SCOVEL concur.

---

8. Both appellants and appellate defense counsel are better served by not blindly citing the trial court pretrial motion practice in an unrelated case, as their sole position justifying confinement credit.

**Appendix A**

The evidence has raised the issue of self-defense in relation to the charged offenses of murder and aggravated assault, particularly in view of the testimony of the accused. Self-defense is a complete defense to these offenses. For self-defense to exist, the accused must have had a reasonable apprehension that death or grievous bodily harm was about to be inflicted on himself, and he must have actually believed that the force he used was necessary to prevent death or grievous bodily harm.

In other words, self-defense has two parts. First, the accused must have had a reasonable belief that death or grievous bodily harm was about to be inflicted on himself. The test here is whether, under the same facts and circumstances presented in this case, an ordinary prudent adult person faced with the same situation would have believed that there were grounds to fear immediate death or serious bodily harm. Because this test is objective, such matters as intoxication or emotional instability of the accused are not relevant. Second, the accused must have actually believed that the amount of force he used was required to protect against death or serious bodily harm.

To determine the accused's actual belief as to the amount of force which was necessary, you must look at the situation through the eyes of the accused. In addition to the circumstances known to the accused at the time, the accused's age, intelligence and emotional control are all important factors to consider in determining the accused's actual belief about the amount of force required to protect himself. As long as the accused actually believed that the amount of force he used was necessary to protect against death or grievous bodily harm, the fact that the accused may have used excessive force, or a different type of force than that used by the attacker does not matter.

The prosecution's burden of proof to establish the guilt of the accused not only applies to the elements of the charged offenses of murder and aggravated assault and to the lesser included offenses, but also to the issue of self-defense. In order to find the accused guilty, you must be convinced beyond a reasonable doubt that the accused did not act in self-defense.

There has been some evidence in this case concerning the accused's ability to leave or move away from his assailant or assailants. A person may stand his ground when he is at a place at which he has a right to be. Evidence tending to show that the accused had an opportunity to withdraw safely is a factor which should be considered along with all the other circumstances in deciding the issue of self-defense.

The accused, under the pressure of a fast moving situation or immediate attack, is not required to pause at his peril to evaluate the degree of danger, or the amount of force necessary to protect himself. In deciding the issue of self-defense, you must give careful consideration to the violence and rapidity, if any, involved in the incident.

*There exists evidence in this case that the accused may have been an aggressor. An "aggressor" is one who uses force in excess of that believed by him to be necessary for defense. There also exists evidence that the accused may have voluntarily engaged in mutual fighting. An aggressor, or one who voluntarily engaged in mutual fighting, is not entitled to self-defense unless he previously withdrew in good faith.*

*The burden of proof on this issue is on the prosecution. If you are convinced beyond a reasonable doubt that the accused was an aggressor, or one who voluntarily engaged in mutual fighting, then you have found that the accused gave up the right to self-defense.* However, if you have a reasonable doubt that the accused was an aggressor, or voluntarily engaged in mutual combat, then you must conclude that the accused retained the right to self-defense, and then you must determine if the accused actually did act in self-defense.

The evidence has raised the issue of defense of another in relation to the offenses of homicide and aggravated assault. A person may use force in defense of another only if that other person could have lawfully used such force in defense of himself or herself under the same circumstances. However, the person may not use more force than the person defended was lawfully entitled to use.

Therefore, if Teresa Wilson was also an aggressor, or intentionally provoked an attack, or was a mutual combatant, then the accused could not lawfully use force in her behalf, regardless of the accused's understanding of the situation.

For defense of another to exist, the accused must have had a reasonable belief that death or grievous bodily harm was about to be inflicted on the person defended, and the accused must have actually believed that the force he used was necessary to protect that person. In other words, defense of another has two parts. First, the accused must have had a reasonable belief that death or grievous bodily harm was about to be inflicted on Teresa Wilson. The test here is whether, under the same facts and circumstances, a reasonably prudent person faced with the same situation would have believed that death or grievous bodily harm was about to be inflicted. Second, the accused must have actually believed that the amount of force he used was necessary to protect against death or grievous bodily harm.

To determine the accused's actual belief as to the amount of force necessary, you must view the situation through the eyes of the accused. In addition to what was known to the accused at the time, the accused's age, intelligence, and emotional control are all important factors to consider in determining his actual belief as to the amount of force necessary to protect Teresa Wilson. As long as the accused actually believed that the amount of force he used was necessary to protect against death or grievous bodily harm, the fact that the accused may have used such force, or a different type of force than that used by the attacker, does not matter.

The burden is on the prosecution to establish the guilt of the accused. Unless you are satisfied beyond a reasonable doubt that the accused did not act in defense of another, you must acquit the accused of the offenses of homicide and aggravated assault.

Record at 1902–04 (emphasis added); Appellate Exhibit LXXXVII at 10–12.

## Appendix B

Record page numbers and applicable trial counsel arguments on the merits and in rebuttal:

1828 (arguing "when the fight did become physical, the [appellant] used that knife during the physical fight and he stabbed three people");

1832 (arguing "this evidence would bury [the appellant], and that shows that right from the beginning the [appellant] had a knife. He was ready. He was armed, and when the opportunity presented itself he used that knife … when the fight turned into something physical" (referring to Mrs. Jennifer Taylor's testimony as to her observing the appellant's hand behind his back in a fist at the beginning of the fight when the appellant was asked by one of the appellant's potential opponents, "What do you have behind your back?" Record at 1831));

1833–34 (arguing the peacemaker MMFN Polydore "is pushed by the [appellant] on the left side of his body, the same locations where he's stabbed, the left side of his back. [Whereupon] he feels pain after being touched by the [appellant]" and "[Teresa] Wilson wasn't punched by [AOAN] Keaton, she wasn't hit by him. [AOAN Keaton] was being held back when the [appellant] rushed on him because he was enraged, and [AOAN] Keaton was on the ground" and "when [AN] Wells comes to save his friend, where is the [appellant]? He's bent over him …. there can't be more access than that to stab somebody. If he didn't stab him from minute one when he attacked him");

1837 (arguing "[t]here's no evidence that there was any knife out during this fight except for the [appellant's], no knives");

1838–39 (arguing "[t]he [appellant] stabbed all three victims. Again, we had one person who had a knife behind his back at the beginning of this fight. We had one person with a bloody knife after this fight is over");

1846–47 (arguing "[the appellant] said he didn't see [the people from the Honda] with any weapons either. There is no evidence of them having any weapons" and, by implication, that the only evidence of any supposed chokehold is presented only by the appellant

in his testimony with all other evidence overwhelmingly supporting the conclusion that a chokehold did not, in fact, occur, and "[t]he evidence shows that [the appellant] stabbed [MM3] Glenzo Taylor. The evidence also shows that he stabbed [MMFN] Polydore and [AOAN] Keaton. The only issue left for you to decide is whether these stabbings were done in self-defense");

1850 (arguing "there's no contradiction here ... Teresa Wilson ... was the aggressor, she started the fight. So when the [appellant] entered the fight, ... [h]e stepped in her shoes.... [He] also became an aggressor in his own right ... [when] he rushed [AOAN] Keaton.... He also became the aggressor ... [when] he introduced that lethal weapon into what ... many witnesses thought was just an ordinary fistfight");

1851 (arguing "at the very least the [appellant] was a mutual combatant" and "[t]his is not a case of self-defense. This is not a case of defense of another. Look at the evidence");

1852 (arguing "[t]his is a case where someone deliberately brought a knife to what could have been just a verbal argument, and when that fight turned into something physical, [the appellant] decided to thrust that knife into three people's bodies, three people who didn't really pose any threat at all");

1853 (arguing "from the beginning [the appellant] had that knife. It wasn't something that in the spur of the moment he took out of his pocket. You know from Mrs. [Jennifer] Taylor [that the appellant] had that knife at the beginning of the fight and he chose to use it with the intent to inflict death and grievous bodily harm");

1874 (arguing "[the appellant] had to concede that he's the stabber of [MM3] Glenzo Taylor, that alone did him in. Knowing that, he concocted ... this choking");

1881 (arguing "we've established this bogus choking just didn't happen"); and

1886–87 (arguing "[t]he guy escalating this thing is the [appellant] by holding the knife behind his back .... and he's not willing to show his hands to them. They're at an extreme disadvantage").

## Appendix C

Record page numbers and applicable civilian defense counsel arguments on the merits:

1853 (arguing "[a]n issue that was obviously well-developed during the course of [*voir dire*] was that of self-defense. You were asked questions about what would you do if you were facing a scenario where you felt your life was in danger. Could you defend yourself? Would you defend yourself? Would you use deadly force if you felt you needed to?");

1854 (arguing "the military judge, in his instructions, will tell you that this is a self-defense case, and you must consider by law the issue of self-defense. So it's not going to be an option in this case, you have to consider that" and "[y]ou must look through the eyes of the [appellant] ... [w]hen you're trying to determine whether or not [the appellant] was entitled to utilize self-defense in a manner in which apparently occurred in this particular case" and "[the appellant] thought he was going to die. And when he thinks he's going to die, he is allowed to protect himself. [The appellant] is allowed to do what happened in this particular case. And each one of you, when we questioned you about this, told us you would do the same thing if you felt you were going to die. Members, this is a self-defense case");

1855 (arguing "[c]redibility is a main issue in this case, a very, very major issue in this case.... You have to access [sic] the credibility of each one of these people");

1857 (arguing "[i]s there one of you who thinks for one second that [the appellant] had any—any imagination that anything like this would ever happen? No. No way");

1860 (arguing "you don't check your common sense when you walk into this courtroom, you're not required to do that");

1862 (arguing "on these two charges of aggravated assault on both [AOAN Keaton and MMSN Polydore], it's a non-issue in this case. The [G]overnment's proof is far short from coming anywhere near closely establishing that [the appellant] was in any manner involved with either of these people");

1863–64 (arguing "[MM3] Glenzo Taylor, it's so tragic that these people have lost him over this thing. But I believe what these people are looking for is justice, not just to nail somebody for what happened, but justice, to ... have all the evidence come out, and have [you, the members,] make a decision as to what happened here");

1864 (arguing "as difficult as it may be for these people to accept this, justice in this case requires an acquittal of these charges" and "if [MM3] Glenzo Taylor and somebody ... was on top of [the appellant], and ... had [the appellant] down, ... and got [the appellant] into a *headlock* like this, it doesn't take much force to scare you. How much force? How long would I have to hold my arm around your neck before you say, 'You're going to kill me?' How long? Five seconds? Two seconds? The only way you can put yourself in the eyes of [the appellant], I'm sorry to say, is to do that! And feel it" (emphasis added) and "[the appellant] sees his friend get involved in something, *has no idea what it is,* and yes, *a horrendous decision he made, one that he will regret for the rest of his life,* is going to help his friend" (emphasis added));

1864–65 (arguing "if a guy is in a confrontation like this and he's got his hands behind his back, or his hands in his pocket like this, is somebody going to be able to see what's going on? No");

1865 (arguing "[t]hey don't have a knife in his hand. The only knife that you've got in this case was in [the appellant's] pocket");

1866–67 (arguing "the prosecution argues ... as an aggressor or mutual combatant, [the appellant's] not entitled to use self-defense.... Think this one through" and "that's not the way the law is.... When that choke hold goes on, when that terminology of a gun being used, when the trunk is being opened, when that kind of stuff is happening, all right, he's entitled to defend himself with deadly force. As the prosecution said, you get a double standard here, a dual prong, it's a reasonable person standard as to whether or not self-defense is necessary. *That is not a question in this case.*

*But the second standard is,* what level of force can be utilized? And that's where you get into ... 'I'm going to die,' and that tells you the level of force to utilize. And as unbelievable as it may be ..., the [appellant] is somehow able, when he's getting beaten on and in a choke hold, get the knife out of his pocket, ... he got it opened, he did what he had to do .... he was successful .... [a]nd if he didn't do that, we don't know .... and we'll never know.... For the rest of his life he's going to have to wonder that" (emphasis added));

1867 (arguing "justice requires making a determination as to whether his force that he used was, in fact, self-defense, and whether it was appropriate, and I believe the evidence in this case is very clear that it was"); and

1871 (arguing "what the law says if [the appellant] believed that he was going to die, that he was going to be hurt seriously, he was legally entitled to use that knife. That's the law, and that's totally binding upon you as court members, ...").